Filed 6/8/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Joseph H., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br>    Plaintiff and Respondent,<br>        v.<br>Joseph H.,<br>    Defendant and Appellant<br>        . | E059942<br><br>(Super.Ct.No. RIJ1100624)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Jean P. Leonard, Judge. Affirmed.

Latham & Watkins, Amy C. Quartarolo, Nima H. Mohebbi and Liliana Paparelli for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

Best, Best & Krieger, Jack Clarke, Jr., Kira L. Klatchko and Irene S. Zurko for the Riverside County Office of Education as Amicus Curiae on behalf of Plaintiff and Respondent.

Joseph H., the minor, at age 10, woke up early one morning and shot his father in the head as the latter slept on the sofa. A wardship petition was filed alleging the minor had committed acts which would have been crimes if committed by an adult, specifically, murder (Pen. Code, § 187, subd. (a)),[1] with a special allegation of discharging a firearm causing death (§ 12022.53, subd. (d)). After a contested hearing, the juvenile court found that the minor understood the wrongfulness of his acts despite the statutory presumption of incapacity (§ 26), had committed an act which would have been second degree murder if committed by an adult, and had discharged a firearm within the meaning of section 12022.53, subdivision (d). The minor was committed to the Department of Juvenile Justice and appealed.

On appeal, the minor argues (1) the court erroneously considered statements obtained in violation of his *Miranda* rights[2]; (2) his evaluation by a prosecution expert during trial, without counsel present, violated his due process rights; (3) the court improperly weighed the evidence in finding that he knew the wrongfulness of his conduct; (4) the true findings must be reversed due to cumulative errors during the adjudicatory hearing; and (5) the court abused its discretion in committing him to the Department of Juvenile Justice. We affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Referring to *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

2

## BACKGROUND

Although the facts relating to the incident are fairly straightforward, a significant amount of evidence was presented to the juvenile court relating to the minor's capacity to commit a crime, and his mental health issues. We provide an overview of the historical information in this section. In the discussion of the individual issues, we will discuss additional evidence introduced at trial as it may be relevant.

The minor, born June 19, 2000, and his younger sister Shirley, lived with their biological mother until Joseph was three or four, when they were placed with their father, Jeff, after numerous reports to Child Protective Services relating to neglect by their mother. Joseph had been exposed to heroin, methamphetamine, LSD, marijuana and alcohol ingested by his biological mother prenatally. Joseph had been physically abused and severely neglected by his mother, and was sexually abused by his mother's boyfriend. By this time, Joseph's father was married to Krista McC., with whom he had three additional children.

Joseph was a difficult child. From the time he was three years old, his paternal grandmother could not babysit him because she could not control his outbursts. He suffered from Attention Deficit Hyperactivity Disorder (ADHD) resulting in trouble at school due to his inability to sit still; he also engaged in impulsive and violent behavior towards both children and teachers, which included hitting, kicking, biting, scratching, stabbing with pencils or other sharp objects, and hitting with objects, as well as running out of class. At school, he also threw tantrums where he threw over all the students' desks and chairs. Joseph had an IEP (Individualized Education Program) for a learning

disability.

Joseph also turned his wrath on the teacher, kicking, hitting, and scratching the teacher, pulling the teacher's hair, calling her a "fucking bitch," and threatening to kill the teacher. Jeff and Krista got therapy for Joseph, but Joseph was in at least six different schools due to violent outbursts and running out of class. Eventually, Jeff and Krista took Joseph out of school and homeschooled him. Joseph also hit his sisters.

For his part, Joseph's father Jeff had an unstable work history and was unemployed for the three years leading up to his death, although he had worked for a time as a plumber. He was addicted to Percocet and methamphetamine, and was frequently violent towards both Krista and Joseph. He was worse when he was drunk or high; on those occasions he would just lose control, and start beating on Joseph. Sometimes Jeff's abuse of Joseph was such that Krista had to intervene. A few days before the shooting, Jeff became violent with Krista, throwing a glass cup at her, which caused a cut. Jeff's mood swings, and his infidelity, made Krista unhappy.

In approximately 2007, after Krista's sister was killed in a hit-run automobile accident involving an undocumented Mexican citizen, Jeff became involved in the National Socialist Movement (NSM, or Neo-Nazis) and the Save Our State (SOS) movement, anti-illegal immigration groups. Jeff owned guns, which he frequently showed off, including a handgun that was kept in the closet of the bedroom. There were no child protection locks for the gun, which was kept loaded. Jeff sometimes took Joseph to the border of Mexico where the NSM group did patrols, and taught Joseph how to use guns.

On April 30, 2011, Jeff and Krista hosted an NSM meeting at their home, described by both Joseph and Shirley as a party, attended by approximately 12 member guests. The meeting started at noon. Alcohol was served, and both Jeff and Krista drank. Between 6:51 and 6:56 p.m., Krista received text messages from Jeff indicating he intended to throw her out of the home. At approximately 7:00 p.m., the meeting ended, and Jeff left with a friend to take a woman member home. Krista fell asleep watching television with her three younger children, while Joseph and Shirley went to their own room. Later that same night, Krista heard Jeff return, and heard him talking to someone on the telephone. She went downstairs and found him in the kitchen, drinking, and in a bad mood. They argued because Jeff found out Krista planned to move out.

In the very early hours of May 1, 2011, Krista was startled awake by a loud noise. Thinking that a kitchen shelf had fallen (as had happened previously), she went to the restroom and then went downstairs. Downstairs, Krista found the television on, but the lights were off. When she turned on the lights, she saw Jeff on the couch, bleeding. Joseph came downstairs and told Krista, "I shot dad." Krista called 911.

At approximately 4:04 a.m., police were dispatched to the residence. All the occupants of the house were required to exit the residence as police performed a safety sweep for other victims or suspects. Jeff was lying on the couch with a large pool of blood emanating from a single gunshot wound to the head. One officer asked Krista what happened while she and the children were outside. Joseph volunteered that he had grabbed the gun and shot his dad in the ear. Joseph explained he did so because his father had beaten him and his mother, and his father had kicked Joseph "in the ass" the

5

day before. Joseph also said he used his father's gun and that he had put it under his bed after the shooting. When the residence was searched, the gun used in the shooting was found under Joseph's bed. Joseph's statements were recorded on a belt recorder and played in open court.

At some point, all the surviving family members were placed in separate police cars. While sitting alone in the back of one patrol car, unhand-cuffed, Joseph talked a lot, although no questions were asked of him. Joseph admitted he had shot his father, said he wished he had not done it, and indicated he knew it was wrong. Joseph asked if his father were dead, or just injured, and explained the events leading up to the shooting. Joseph told the officer his father had abused him and other members of the family repeatedly, and that the previous night, his father had threatened to remove all the smoke detectors and burn the house down, while the family slept. Joseph was aware of his father's new girlfriend and was concerned that he would have to choose between living with his dad or his mom.[3] Joseph explained that his father returned home and fell asleep on the couch, after which Joseph got the gun from his mother's bedroom, went downstairs and shot his father in the head. He did not mention being told by anyone else to shoot his father. However, Joseph was worried that his sisters would be angry with him.

At the police station, Joseph was interviewed by Detective Hopewell, who first asked questions to determine if he understood the difference between right and wrong,

---

[3] Joseph referred to his stepmother Krista as his mother. We will refer to her as his stepmother, except when quoting Joseph or another witness.

before admonishing Joseph of his *Miranda* rights. A videotape of the interview was played in open court. Joseph admitted shooting his father and explained the circumstances much as he had done in the patrol car. Specifically, Joseph described how his father came home, the family decided to have a movie night, then going to bed where he woke up after a little while and "started thinking that I should end the son versus father thing."

On May 3, 2011, a wardship petition was filed pursuant to Welfare and Institutions Code, section 602, alleging that Joseph had committed an act which would be a crime if committed by an adult. Specifically, the petition alleged that the minor had committed murder (§ 187, subd. (a)), and that in the commission of the crime, he personally discharged a firearm that proximately cause death (§ 12022.53, subd. (d)).

At the initial hearing, Joseph's counsel requested that the minor be evaluated in anticipation of entering a plea of not guilty by reason of insanity. At a subsequent hearing—still prior to entering a plea on the petition— delinquency proceedings were suspended pursuant to Welfare and Institutions Code section 709, to determine Joseph's competency.[4] Drs. Miller and Rath, psychologists, were appointed for this evaluation. On March 28, 2012, the reports of the appointed evaluators were read and both counsel stipulated that the issues of competency be submitted to the court. The court considered the psychological evaluations and concluded the minor was competent. Delinquency proceedings were reinstated.

---

[4] The clerk's minutes refer to Welfare and Institutions Code section 790, but the actual referral was made pursuant to section 709.

On June 5, 2012, Joseph entered pleas of not guilty and not guilty by reason of insanity (NGI). The court ordered an NGI evaluation to be conducted by two experts, appointing Dr. Kania and Dr. Rath. Between May 3, 2011 and May 18, 2012, three separate applications regarding psychotropic medications were made and granted to address Joseph's ADHD. On July 9, 2012, Dr. Rath submitted his report finding Joseph was not insane. On July 24, 2012, Dr. Kania submitted his report, reaching the same conclusion.

The contested jurisdictional hearing commenced on October 30, 2012. Minor's counsel objected to the admission of Joseph's responses to questions asked by Detective Hopewell, pursuant to a section 26 questionnaire (see *In re Gladys R.* (1970) 1 Cal.3d 855, 862 (*Gladys R.*)), because the inquiry was conducted before he was admonished of his *Miranda* rights. The court was concerned about two questions and their responses and struck them. However, the court eventually reconsidered and ruled that the response to one question was admissible.

Counsel also argued that the minor's statements were obtained in violation of *Miranda* because there were two people present,[5] the minor was admonished that the decision to answer questions was his choice and his mother's choice, and the detective did not adequately explain that Joseph did not have to talk to her. The court overruled these objections.

Additionally, on the third day of trial, the minor objected to any testimony by Dr.

---

[5] Although minor's counsel did not expressly indicate, we assume the second objection was made on the ground of involuntariness.

8

Rath as to Joseph's capacity to commit the crime on the ground Dr. Rath was inappropriately appointed to conduct evaluations both as to the minor's capacity as well as on the issue of sanity. The court sustained the objection, but allowed the prosecutor to retain another expert on the issue of the minor's sanity. The court granted the prosecution's request that Dr. Salter be permitted to interview the minor and that she would be permitted to testify for the purpose of impeaching the minor's expert. Defense counsel requested to be present when Dr. Salter interviewed the minor, but the court denied the request. Later, minor's counsel objected to Dr. Salter's report on the ground of late discovery, which objection was overruled.

In the end, the parties stipulated to the admissibility of the reports of Dr. Salter and Dr. Geffner (the defendant's expert), and, after the People rested, the minor withdrew his plea of not guilty by reason of insanity. The minor made a motion to dismiss pursuant to Welfare and Institutions Code section 701.1, which was denied. The court found by clear proof that the minor knew the wrongfulness of his acts, within the meaning of section 26. The court ruled the minor came within Welfare and Institutions Code section 602 upon a finding that the allegations of the petition were true, specifically, that the minor had committed second degree murder, a felony, and that he personally and intentionally discharged a firearm.

The probation officer's dispositional report recommended commitment to the Division of Juvenile Justice (DJJ) because the minor was screened by 15 different county and private placements, and had been rejected by all but one, which referral was still pending. The probation officer indicated that the minor appeared to be beyond the scope

9

of any private or county facilities, including the Youthful Offender Program (YOP), because he posed a serious risk to the community, and because he was in need of a long term, highly structured, well-supervised environment. The average commitment to YOP was seven months, and the average age of the minors at YOP was 17. At YOP, Joseph would not be eligible for most of the programs because they were not age appropriate. Most significantly, Joseph was not eligible for probation because of the true finding on the gun discharge enhancement.

The probation officer noted that DJJ had screened the minor, but a diagnostic study pursuant to Welfare and Institutions Code section 704[6] would have to be completed first, because of Joseph's age. Additionally, the Screening Committee decided to have the minor's case screened by the Department of Mental Health (DMH) for a Rate Classification 13/14 Level (RCL) placement,[7] requiring more time. The court continued

---

[6] The court's order referred to a 90-day diagnostic study pursuant to Welfare and Institutions Code section 707.2. However, section 707.2 relates to criminal defendants under the age of 18, who are eligible for treatment at CYA (now DJJ) pursuant to Welfare and Institutions Code section 1731.5. For minors found to be persons described by Welfare and Institutions Code section 602 who are eligible for commitment to CYA (now DJJ), the diagnostic study is conducted pursuant to Welfare and Institutions Code section 704.

[7] This rate classification apparently refers to the California Department of Social Services (CDSS) and Foster Care Rates Bureau classification levels of group homes, according to a report entitled "The Classification of Group Home Programs under the Standardized Schedule of Rates System," prepared by CDSS on August 30, 1989. (See Welf. & Inst. Code, § 11462, subd. (b).) The rates are set depending on the level of care required by a child, based on a point system, with Rate Classification Levels 13 and 14 representing the highest level of care.
(See, http://www.childsworld.ca.gov/Res/pdf/OverviewClassificationLvls.pdf as of January 15, 2015.)

the disposition hearing to facilitate the diagnostic study.

On February 15, 2013, the Department of Mental Health submitted its assessment for the RCL 13/14 level of care. The assessment indicated Joseph qualified for RCL 14 level, but had not been certified. DMH believed Joseph had neurological issues and would benefit from participating in an MRI (magnetic resonance imaging) to determine the extent of damage done to his brain due to his past history[8]. To this end, the probation officer requested that the court order a functional MRI, although the record does not indicate whether this was ordered or performed. The report also indicated that on the date of the shooting, Joseph was not taking his psychotropic medications. The probation officer noted, in response to the court's request for an update, that an IEP had been completed on August 28, 2012, and had been updated on February 11, 2013.

On March 1, 2013, the court ordered the probation officer to submit another addendum report to follow up on a letter from Copper Hills Youth Center of Utah, indicating that Joseph was eligible for placement there. The probation officer did so after contacting Copper Hills Youth Center. However, the probation officer learned that the facility had accepted Joseph without having interviewed him, based solely on the recommendation of an official with DMH that Joseph was a level-headed, polite kid. Copper Hills took his word for it that Joseph would be a good fit. The probation department had reservations about the acceptance because no out-of-state facility had

---

[8] The probation report does not indicate whether the Department of Mental Health was concerned about Joseph's past history of prenatal substance abuse exposure, the physical abuse he suffered, or his history of behavioral problems.

ever accepted a minor without interviewing the minor either in person, or via telephone. The probation officer was also concerned that Copper Hills was a 197-bed facility with 119 openings. The probation officer again recommended commitment to DJJ. On April 2, 2013, the court ordered the Welfare and Institution Code section 704 diagnostic evaluation.

On April 29, 2013, the probation officer submitted an ex parte memo, outlining difficulties with the DJJ packet that prevented completion of the diagnostic study. The DJJ reported the packet that had been sent contained errors, one of which was the fact that the correct Welfare and Institutions Code section for the examination was 704, not 707.2, as indicated in the minute order. For this reason, as of June 3, 2013, the DJJ diagnostic study had not been completed due to an apparent bureaucratic runaround. Nevertheless, on July 22, 2013, the DJJ sent a letter informing the probation department that Joseph had been accepted.

On July 15, 2013, the minor's educational advocate filed a motion to join the Riverside County Office of Education (RCOE). The grounds for joinder related to the fact that administrative law proceedings were ongoing to determine what the least restrictive educational placement would be for the minor under federal law, and that this information would be relevant to the issue of whether the minor would benefit from a DJJ placement. On October 7, 2013, the court denied the joinder motion without prejudice.

The contested dispositional hearing commenced October 21, 2013. The parties stipulated that the court consider several expert evaluations and reports assessing Joseph. Minor's counsel informed the court there were two additional possible placements to

consider, namely the San Diego Children's Center, and the Devereaux School in Texas. The court ordered counsel to provide information to the probation department for a verbal report On October 25, 2013, during a break between witnesses, the probation officer reported that neither of the proposed alternative placements were secured facilities. Further, the San Diego Center for Children had informed the probation officer that it would not accept a case such as Joseph's due to the magnitude of this case.

The court reviewed the documentary evidence and heard testimony over several days. On October 31, 2013, the court found that less restrictive alternatives would be ineffective and inappropriate, and that commitment to DJJ would be beneficial. The court noted that the minor is a danger to the public who must be housed in a secure facility, and that he would not receive the intensive services he needs, nor would society be protected, in a less restrictive placement. The court adjudged the minor a ward of the court, found he was a person with exceptional needs, and committed him to the DJJ. The court set his maximum confinement time as 40 years to life, consisting of 15 years to life for the murder finding, plus 25 years to life for the gun discharge enhancement pursuant to section 12022.53, subdivision (d).

The minor timely appealed.

**DISCUSSION**

1.     *The Juvenile Court Did Not Err in Admitting the Minor's Statements in Response to Questions Relating to His Capacity to Commit a Crime.*

     a.     *Background*

After being taken to the police station, the minor was interviewed by Detective Hopewell, a detective assigned to the Sexual Assault and Child Abuse Unit, whose role was to interview Joseph and his siblings. Prior to admonishing Joseph of his *Miranda* rights or interviewing him about the shooting itself, the detective asked him questions pursuant to a *Gladys R.* questionnaire, designed to determine if an arrestee under the age of 14 understands the wrongfulness of his or her actions, within the meaning of section 26.

Following that questionnaire, the detective asked Joseph if stealing candy from a store without paying for it was right or wrong; Joseph replied it was wrong. She then asked Joseph to give her an example of doing something right and doing something wrong. Joseph responded that doing wrong things could hurt people, while it was good to care, and to help people. After asking him for an example of something that he would do that would be right, she asked Joseph to give an example of doing something that was wrong, to which Joseph replied, "Well, I shot my dad." Shortly thereafter, the detective advised Joseph pursuant to *Miranda* and proceeded to question him about the shooting.

At trial, minor's counsel objected on the ground that Joseph was in custody when asked the questions from the *Gladys R.* questionnaire, but he had not been *Mirandized*, rendering his responses to the *Gladys R.* questionnaire inadmissible. Counsel also argued

14

that the statements obtained after the admonishment must be excluded because they were tainted by the initial failure to admonish. Minor's counsel later objected that the *Miranda* warning given by the detective was defective because she told Joseph that the choice to remain silent was his choice and his mother's choice.

On appeal, the minor renews the argument that Joseph's statements in response to the questions asked prior to being *Mirandized* were inadmissible. In addition, the minor argues that his waivers under *Miranda* were involuntary because he did not understand the nature of his right to be free of coercive confessions due to his mental disabilities and because his stepmother was present, creating a coercive atmosphere.[9] On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*. (*People v. Davis* (2009) 46 Cal.4th 539, 586.)

> b.      *Any Error in Failing to Admonish the Minor of his Miranda Rights Prior to Conducting the Gladys R. Inquiry Was Harmless Beyond a Reasonable Doubt.*

The United States Supreme Court has recognized that any police interview of an individual suspected of a crime has coercive aspects to it. (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [97 S.Ct. 711, 50 L.Ed.2d 714].) Those interrogations that occur while a suspect is in police custody heighten the risk that statements obtained are not the product of the suspect's free choice. (*Dickerson v. United States* (2000) 530 U.S. 428,

---

[9] The last two theories were not argued in the trial court. Nevertheless, we have discretion to address them. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.)

435 [120 S.Ct. 2326, 147 L.Ed.2d 405].)  For this reason, *Miranda* warnings are required before a person is subjected to a custodial interrogation, which is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  (*Miranda, supra,* 384 U.S. at p. 444.)

Because the prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination come into play for custodial interrogations, an officer's obligation to administer *Miranda* warnings attaches only where there has been such a restriction of freedom of movement as to render the suspect "in custody." (*Stansbury v. California* (1994) 511 U.S. 318, 322 [114 S.Ct. 1526, 128 L.Ed.2d 292].) This determination is based on the objective circumstances of the interrogation.  (*Ibid.*) Two inquiries are essential to this determination:  first, what are the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112 [116 S.Ct. 457, 133 L.Ed.2d 383].)

Even for an adult, the physical and psychological isolation of custodial interrogation can undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely.  (*Miranda, supra,* 384 U.S. at p. 467.)  The pressure of custodial interrogation is so immense that it can induce a frighteningly high percentage of people to confess to crimes they never committed.  (*Corley v. United States* (2009) 556 U.S. 303, 321 [129 S.Ct. 1558, 173 L.Ed.2d 443].)

16

The risk is all the more troubling and acute when the subject of custodial interrogation is a juvenile. (*J.D.B. v. North Carolina* (2011) ___U.S.___ [131 S.Ct. 2394, 2401, 180 L.Ed.2d 310].) Recognizing the inherently coercive nature of custodial interrogation, it has long been held that prior to questioning, a suspect must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed. (*Miranda, supra,* 384 U.S. at p. 444.)

In some circumstances, a child's age will affect how a reasonable person in the suspect's position would perceive his or her freedom to leave. (*J.D.B. v. North Carolina, supra,* 131 S.Ct. at pp. 2402-2403.) Thus, where the child's age is known to the officer at the time of police questioning, or would have been objectively apparent to the reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test, although the child's age may not be a determinative factor in every case. (*Id*. at p. 2406.)

A significant factor in the present case is the fact that the detective commenced the interview with a *Gladys R.* questionnaire. That questionnaire was designed to satisfy the requirement of section 26 that a child under 14 appreciate the wrongfulness of his or her conduct. It is well settled that in order to become a ward of the court under Welfare and Institutions Code section 602, clear proof must show that a child under the age of 14 years at the time of committing the act appreciated its wrongfulness. (*Gladys R., supra,* 1 Cal.3d at p. 862.) The *Gladys R.* questionnaire was devised specifically for minors suspected of committing an offense that would be criminal if committed by an adult. The

detective would not have needed to make a determination that Joseph appreciated the wrongfulness of his conduct if there had been no intention of charging him with a crime. Thus, the fact that the detective commenced the interview with a *Gladys R.* questionnaire is, in itself, a factor which leads us to conclude the minor was in custody at the time.

The court never expressly ruled on the question of whether the minor was in custody at the time the detective commenced the *Gladys R.* inquiry. However, the questionnaire used in this case carried the warning that a minor should be *Mirandized* prior to asking the questions designed to determine if he or she appreciated the wrongfulness of his conduct. This, the detective did not do. For this reason, the court expressed concern about Joseph's responses to questions 3 and 7 of the *Gladys R.* questionnaire.[10] The court initially concluded that the minor should have received *Miranda* warnings prior to asking the questions at the top of the form, including questions 3 and 7, because the statements were testimonial, requiring advisals. Later, however, the court reconsidered the exclusion of the response to question No. 7.

Joseph was transported to the police station after making several spontaneous incriminatory statements. Before being admonished of his *Miranda* rights, the detective stated, "Right now, you know you're here because of what happened to your dad?" The

---

**10** Question No. 3 of the *Gladys R.* questionnaire asked, "Give me an example of something that is wrong to do." In response to this question, Joseph stated, "Well, I shot my dad." Question No. 7 (as adapted by the detective) inquired, "And, at the time that you hurt your dad, did you know it was wrong to do that?" The court found that the failure to admonish Joseph of his rights under *Miranda* required the exclusion of his response to question No. 3, but eventually decided to admit the response to No. 7, with the proviso that the court would give it minimal weight.

detective had already interviewed Joseph's stepmother and siblings, and had learned that the previous day Joseph was upset with his father and told his sister he wanted to shoot his father. The minor was in custody.

The juvenile court's concern with whether the statements were testimonial or not was irrelevant; as party admissions, they were admissible under Evidence Code section 1220 and not subject to exclusion for violating the Confrontation Clause. (Ref. *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354].) The detective should have advised Joseph of his constitutional rights prior to asking any questions about his appreciation of the wrongfulness of his conduct. But this does not end our inquiry.

Even assuming that the *Gladys R.* questions violated the principles of *Miranda,* the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L. Ed. 2d 705, 87 S.Ct. 824]; *People v. Davis* (2009) 46 Cal.4th 539, 594.) Prior to being taken to the police station, Joseph spontaneously and repeatedly informed various officers who responded to the initial dispatch after the shooting that he had shot his father. For instance, when police initially responded to the scene of the shooting, and secured the house, Officer Moulton spoke with Krista, and asked her what happened. Joseph volunteered that he had grabbed the gun and shot his father in the ear because his father had beaten him and his mother. Additionally, Officer Monreal assisted in containing the perimeter of the residence. Before conducting a safety sweep of the residence, he spoke with Joseph, although he did not ask any questions. Joseph said he had shot his father in the head and discussed how his father had hurt him and his siblings.

19

Joseph's sister said, "I thought you were going to shoot him in the stomach." Officer Foster was also involved in the sealing or securing of the scene. When he went back outside the house, Krista stated there had been a shooting, and Joseph volunteered that the gun was under his bed. Later, Joseph was placed in the backseat of Officer Foster's patrol vehicle, where Joseph talked about how he had shot his father.

Joseph also made incriminating admissions to his stepmother and sister, to which no objections were made at trial. Even if the incriminating responses to question numbers 3 and 7 of the *Gladys R.* questionnaire had been excluded, the remaining statements, admitted without challenge at trial, provided the same information to the trier of fact. Thus, unless there was a defect in the *Miranda* advisement or Joseph's waiver of his rights under *Miranda,* no different result would have been obtained, under any standard.

     c.     *Joseph's Waiver of His Right to Remain Silent was Voluntary*.

The minor refers to the videotape and transcript of the interview as support for the assertion that Joseph fundamentally misunderstood the nature of *Miranda* and his right to be free of coercive confessions. He argues that his equivocal response when the detective asked if understood what she was saying, his body language, and his hesitation showed he did not understand what was being explained. We disagree.

To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375.) This determination requires "an evaluation of the defendant's state of mind" (*People v. Williams* (2010) 49 Cal.4th 405,

20

428) and an "inquiry into all the circumstances surrounding the interrogation." (*Fare v. Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 99 S.Ct. 2560] (*Fare*).) The totality of the circumstances approach is adequate to determine whether there has been a waiver even where the interrogation involves juveniles. (*Id.* at p. 725; *People v. Lessie* (2010) 47 Cal.4th 1152, 1167 (*Lessie*).)

Admissions and confessions of juveniles require special caution, and courts must use special care in scrutinizing the record to determine whether a minor's custodial confession is voluntary.[11] (*Lessie, supra,* 47 Cal.4th at pp. 1166-1167, citing *Haley v. Ohio* (1948) 332 U.S. 596, 599 [92 L.Ed. 224, 68 S.Ct. 302].) Age may be a factor in determining the voluntariness of a confession. (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 209.) This is because threats, promises, confinement, and lack of food or sleep, are all likely to have a more coercive effect on a child than on an adult. (*In re Aven S*. (1991) 1 Cal.App.4th 69, 75.) Similarly, the mental sub-normality of an accused does not ipso facto render his confession inadmissible; it is but one factor, albeit a significant one, to be considered with all others bearing on the question of voluntariness. (*People v. Lara* (1967) 67 Cal.2d 365, 386.) But it cannot be said that a juvenile cannot waive constitutional rights as a matter of law. (*Id.* at pp. 390-391.) It is a factual matter to be decided by the trial judge in each case. (*Id.* at p. 391.)

---

[11] We are aware of research suggesting that juveniles, even those without learning disabilities, are incompetent to waive their *Miranda* rights from a developmental standpoint. (Grisso and Schwartz, *Youth on Trial*, *A Developmental Perspective on Juvenile Justice,* (Chicago Press, 2000), pp. 105, 113-115.) However, no evidence of developmental incompetence was presented at trial and this record is devoid of that evidence.

The test for determining whether a confession was voluntary is whether the questioned suspect's will was overborne at the time he confessed. (*People v. Cruz* (2008) 44 Cal.4th 636, 669.) A confession is involuntary under the federal and state guaranties of due process when it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. (*People v. Benson* (1990) 52 Cal.3d 754, 778 (*Benson*), citing *Hutto v. Ross* (1976) 429 U.S. 28, 30 [50 L.Ed.2d 194, 97 S.Ct. 202] (*per curiam*).) Coercive police activity is a necessary predicate to a finding that a confession was involuntary under both the federal and state Constitutions. (*Colorado v. Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 107 S.Ct. 515]; *People v. Kelly* (1990) 51 Cal.3d 931, 973.) On the record before us, there is no evidence of coercive police activity to support such a finding.

On appeal, the determination of a trial court as to the ultimate issue of the voluntariness of a confession is reviewed independently in light of the record in its entirety, including all the surrounding circumstances. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 93 S.Ct. 2041]; *Benson, supra,* 52 Cal.3d at p. 779.) We therefore exercise our independent judgment and apply federal standards to determine whether the statements were involuntary, coerced, or obtained in violation of *Miranda.* (*People v. Massie* (1998) 19 Cal.4th 550, 576; *In re Aven S., supra,* 1 Cal.App.4th at pp. 69, 76.)

Here, the minor points to his age, and the fact that he suffers from ADHD and other mental disabilities, to argue that he was susceptible to suggestion. The minor relies on the testimony of Dr. Geffner's opinion that "[H]aving borderline intellectual

22

functioning and other cognitive deficits can make a person more easily suggestible." This may be true, but Dr. Geffner's suggestion that it was "possible" he was more easily suggestible, is not evidence that Joseph was, in fact, suggestible or confused. The detective repeatedly asked Joseph if he understood what she was explaining about his rights, and when he demonstrated misunderstanding, she provided additional explanation; Joseph's responses indicated he understood. Nothing in the record supports the premise that he was confused or suggestible.

The minor also argues that his communication deficits made it "self-evident that he would have had trouble effectively communicating his reservations and preserving his rights." The videotape of the interview shows he had no trouble communicating, aside from needing explanation of a few terms. In this respect, the detective was careful to follow up the explanation of his rights with questions to insure he understood what she was explaining, so the assertion he had difficulty communicating his reservations is not supported by the evidence.

The minor argues that the presence of his stepmother (whom he accused at trial of inducing him to commit the crime) created a coercive atmosphere. The video (which we have viewed) reveals that Joseph frequently looked to his stepmother for support, so we are not persuaded. Even if her presence had created a coercive atmosphere, the minor has not demonstrated any *police coercion*, a prerequisite to a finding of involuntariness, so this argument fails. (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.)

Further, the record does not support the minor's assertion that his hesitation, confusion, and misunderstanding of the full scope of what it meant to "waive" his rights,

23

showed involuntariness.  To the contrary, the video shows he felt guilty for what he had done.  Absent coercive conduct by police, and despite his young age, his ADHD, and low-average intelligence, the finding that Joseph voluntarily waived his rights, guaranteed by the Fifth Amendment, is supported by the record.

2.     *The Juvenile Court Did Not Err in Permitting Dr. Salter to Evaluate the Minor Without Counsel Being Present, or in Appointing Dr. Salter Mid-Trial.*

During trial, defense counsel objected to Dr. Rath's report and testimony on the issue of sanity because the expert had been appointed to conduct both a competency and a sanity evaluation.  After researching the issue, the court agreed that Dr. Rath could not testify.  The court permitted the prosecution to retain its own expert to evaluate the minor in order to impeach testimony proffered by the minor's expert, Dr. Geffner, on the issue of Joseph's capacity, under section 26.  On appeal, the minor argues that Dr. Salter's evaluation of Joseph during trial, without defense counsel being present, violated his right to statutory due process, and right to counsel.  We disagree.

When a minor in a juvenile proceeding places his mental state in issue, the prosecution may obtain a court order that the defendant submit to examination by a prosecution-retained mental health expert.  (§ 1054.3, subd. (b)(1); *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1119 (*Maldonado*).)  Minor sets forth the due process rights which protected him, including the right to notice, and the opportunity to prepare and present a defense, as well as the right to counsel at critical stages of the process.  However, he cites no authority holding that counsel must be present at a

24

psychiatric or psychological evaluation. Absent a due process right to the presence of counsel at an examination, there can be no violation of such a right.

There is no due process right to have counsel present at a psychiatric examination. To the contrary, case law supports the proposition that the presence of counsel at the psychiatric examination is not constitutionally required as long as three conditions are met: (1) counsel is informed of the appointment of psychiatrists; (2) the court-appointed psychiatrists are not permitted to testify at the guilt trial unless the defendant places his mental condition into issue; and (3) where the defendant does place his mental condition into issue at the guilt trial, and the psychiatrist testifies, the court must give the jury a limiting instruction. (*Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 469.) With those protections, a defendant is not entitled to counsel at the psychiatric examinations, although the trial court, in its discretion, may permit counsel to be present as an observer. (*Ibid.*)

Further, in denying defense counsel's request to be present, the court referred to Dr. Geffner's own testimony as its reasoning. Dr. Geffner testified that having observers present during an evaluation risked tainting the results. To argue now that the court erred by disallowing counsel to be present at the evaluation is to contradict the minor's own expert.

The minor also argues that the introduction of Dr. Salter's testimony was procedurally improper under section 1054.3, subdivision (b)(1), because the prosecution's request was not timely. In this respect, minor's argument must fail because the prosecution's timing was the direct product of the minor's objection to the testimony

25

by Dr. Rath, made midtrial. The contested jurisdictional hearing commenced on October 30, 2012, when in limine motions and opening statements were made. Defense counsel raised the issue of whether Dr. Rath could testify on the basis of the improper dual appointment on November 2, 2012, the third day of trial. The prosecution informed the court that it had just received Dr. Geffner's report when the trial commenced, and that it needed to have another doctor review that report. The court put the issue over until the following Monday, November 5, 2012, to research the issue.

At that time, the court concluded that Dr. Rath should not have been appointed to conduct both the competency and the capacity assessments. Because the issue had been "sprung" on the prosecution at the last minute the previous Friday, the court determined that the prosecutor should have some time to get another doctor, in case it was necessary to impeach Dr. Geffner's testimony. The timing of the prosecution's request and the subsequent break in the proceedings to allow the prosecutor's expert to evaluate Joseph, prepare a report, and serve it on the defense, was the direct product of the timing of the objection to Dr. Rath's testimony. This is not to say that defense counsel acted improperly or in bad faith. Nevertheless, the trial court properly granted leave for the prosecution to retain an expert to review Dr. Geffner's late-received report and to prepare for rebuttal.

Because the prosecution made its request at the earliest *possible* time, given the timing of the minor's objection to Dr. Rath's report and testimony, we cannot say it was untimely. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 287 [prosecutor produced notes to the defense the same morning he received them, during trial, held to be timely]; see

26

also, *Butler v. Bell Helicopter Textron, Inc.* (2003) 109 Cal.App.4th 1073, 1084, fn. 18 [statutory interpretations that defy common sense, or lead to mischief or absurdity, are to be avoided], citing *California Mfrs. Assn. v. Public Utilities Comm.* (1979) 24 Cal.3d 836, 844; see also, *Garcia v. Superior Court* (2006) 137 Cal.App.4th 342, 348 ["To this, we add that statutes should be construed with a dollop of common sense."].) We interpret the term "timely," found in section 1054.3, subdivision (c), in a common sense manner, to mean "at the earliest time possible."

Regarding the minor's argument that the introduction of Dr. Salter's testimony was "procedurally improper," we note that the minor's only objections at trial were that the prosecution's request was untimely, and that receipt of discovery of the expert's report was late. He did not object on the ground of any other procedural irregularity at trial, so he has forfeited that claim. (Evid. Code, § 353; *People v. Banks* (2014) 59 Cal.4th 1113, 1193.)

Dr. Geffner testified about Joseph's ability to appreciate the wrongfulness of his conduct due to neurological impairment resulting from abuse, neglect, and limited intellectual functioning. Whether necessary to present evidence on the NGI issue[12] or the capacity issue, the prosecution was entitled to a fair opportunity to rebut any mental-state

---

[12] Because, the minor's NGI plea had not been withdrawn at that particular point in the proceedings, a second opinion was required for the sanity determination. (Welf. & Inst. Code, § 702.3, subd. (d) [providing the procedures set forth in §§ 1026, et seq., are applicable when a minor enters an NGI plea]; § 1027 [requirement that the court appoint two or more psychiatrists or psychologists to investigate the defendant's mental status].) With the exclusion of Dr. Rath's report and testimony on the NGI issue, a second expert was needed until the point when the defendant actually withdrew his NGI plea.

27

evidence pursuant to section 1054.3, subdivision (b)(1). (*Maldonado, supra,* 53 Cal.4th at p. 1117.)

To the extent that section 1054.3 passes constitutional muster (*Maldonado, supra,* 53 Cal.4th at p. 1132, fn. 12 [reciprocal discovery provisions satisfy due process]), and to the extent the timing of the prosecutor's request was directly related to the timing of the defense objection to Dr. Rath's testimony, the order permitting the prosecution to retain its own expert was procedurally proper.

3.      *There Is Substantial Evidence to Support the Juvenile Court's Finding that Joseph Understood the Wrongfulness of his Conduct.*

Pursuant to section 26, a minor under the age of 14 is presumed to be incapable of committing a crime. Thus, a finding of capacity is a prerequisite to an adjudication of wardship for a minor under 14. (*Gladys R., supra,* 1 Cal.3d at p. 867; see also, *People v. Cottone* (2013) 57 Cal.4th 269, 280.) The presumption of incapacity may be rebutted by the production of "clear proof" that the minor appreciated the wrongfulness of the conduct when it was committed. (*In re Manuel L.* (1994) 7 Cal.4th 229, 232.) "Clear proof" means clear and convincing evidence. (*Id* at p. 232.)

The test on appeal is whether substantial evidence supports the conclusion of the trier of fact. (*In re James B.* (2003) 109 Cal.App.4th 862, 872 (*James B.),* citing *In re Paul C.* (1990) 221 Cal.App.3d 43, 52.) We review the entire record in the light most favorable to the judgment and affirm the trial court's findings that the minor understood the wrongfulness of his conduct if they are supported by substantial evidence—that is, evidence that it reasonable, credible, and of solid value—from which a reasonable trier of

fact could have made the requisite finding under the governing standard of proof. (*James B., supra,* 109 Cal.App.4th at p. 872.)

In determining capacity pursuant to section 26, the juvenile court must consider the child's age, experience, and understanding. (*Gladys R., supra,* 1 Cal.3d at p. 864; *James B., supra,* 109 Cal.App.4th at pp. 872-873.) A minor's knowledge of his act's wrongfulness may be inferred from the circumstances, such as the method of its commission or its concealment. (*People v. Lewis* (2001) 26 Cal. 4th 334, 378, citing *In re Tony C.* (1978) 21 Cal. 3d 888, 900.)

Here, Dr. Salter testified that Joseph knew the difference between right from wrong. The court heard the testimony of Drs. Geffner and Salter, and read all the reports and statements that were admitted into evidence, including Joseph's own statements that he understood right from wrong, and understood he would be punished when he did something wrong. The court also considered Joseph's age and the circumstances of the crime, including Joseph's planning of the event while lying in bed (when he decided to end the "father-son thing") and the fact he hid the gun under his bed to avoid getting caught. These factors support the trial court's finding.

In arguing that Joseph lacked capacity to commit the crime, the minor relies exclusively on the report and testimony of the defense expert, Dr. Geffner. But as a reviewing court, we are required to review the entire record, giving deference to the trier of fact, viewing the evidence in the light most favorable to the respondent, and presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577.) We have no

power to reweigh the evidence or judge the credibility of witnesses (*People v. Moore* (2010) 187 Cal.App.4th 937, 940) and we must discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity. (*Ibid.*)

The minor also argues that the trial court's finding was based on inadmissible evidence, obtained in violation of Joseph's *Miranda* rights. As we have previously held, only one statement was obtained in violation of Joseph's *Miranda* rights, and a myriad of other statements were available for the court's consideration. The wealth of other admissible statements by Joseph, in which he discusses the circumstances of the crime and his understanding of what he did, persuades us that the court's finding pursuant to section 26 was not tainted in any way.

Additionally, the minor argues that in the vast majority of published cases in which the capacity finding has been upheld, strong emphasis was placed on the child's age. He emphasizes that Dr. Geffner's testing showed Joseph's mental age was younger than his chronological age. This argument is also unpersuasive. Age is but one factor to be weighed, and Dr. Geffner's *opinion* was not binding on the court. (*People v. Wright* (1988) 45 Cal.3d 1126, 1142; *People v. Engstrom* (2011) 201 Cal.App.4th 174, 187; see also, *In re Thomas C.* (1986) 183 Cal.App.3d 786, 797.)

The minor argues that the circumstances of the crime compel a conclusion he did not appreciate the wrongfulness of his conduct, pointing to the fact that he walked into his stepmother's room where she and a few of the other children were asleep, took the gun, went downstairs to shoot his father, causing a loud noise that awoke the house occupants, then went upstairs, hid the gun under his bed and told his stepmother what he

30

had done. These circumstances may raise an inference that Joseph was not a sophisticated criminal, but they do not support an inference that he failed to appreciate the wrongfulness of his act. To the contrary, secretly taking a gun while the occupants of the house, including the victim, were asleep, shooting his father, and then hiding the gun under his bed, demonstrate he knew what he was doing was wrong, as well as some degree of sophistication.

Finally, the minor argues that the court erroneously "weighed the evidence" in finding that Joseph knew the wrongfulness of his conduct. We do not need to reach this issue because it is a well-established rule that reviewing courts are not permitted to reweigh the evidence. (*In re Aarica S.* (2014) 223 Cal.App.4th 1480, 1488; *In re Juan G.* (2003) 112 Cal.App.4th 1, 6.)

The court found by clear and convincing evidence that Joseph knew the wrongfulness of the act. Substantial evidence supports this finding.

4. *There Was No Cumulative Error Requiring Reversal.*

The minor argues that the "conviction" (true finding) should be reversed due to the cumulative prejudicial errors during the "guilt phase" (adjudicatory or jurisdiction hearing) of the trial. We disagree.

It is theoretically possible that a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; *People v. Hill* (1998) 17 Cal.4th 800, 844.) However, in this case, we have found only one, non-prejudicial error. Reversal is not required.

31

5.  *The Juvenile Court Did Not Abuse Its Discretion In Committing the Minor to the Division of Juvenile Justice.*

The minor argues the disposition was procedurally and substantively unreasonable, in that "[t]he juvenile court refused to consider viable alternative placements for Joseph, and placed him at the DJJ[13] despite overwhelming evidence that the DJJ was unfit to provide him with the educational and mental health services he needs." We disagree.

a.  *Preliminary Matters—The Outstanding Augment Request*

We reserved the decision on the minor's request to augment the record to include the January 24, 2014 Administrative Law Judge's decision in the case of *Joseph Hall v. Riverside County Office of Education,* by the California Office of Administrative Hearings (OAH).[14]  Our order deemed it a request for judicial notice.  We now decline to take judicial notice of the opinion because (a) it was not submitted to the juvenile court for consideration in connection with the dispositional hearing; (b) it is cumulative of other information presented at the contested disposition hearing; and (c) it is not relevant to the issue of whether the trial court properly exercised its discretion in determining the proper disposition for the minor.

---

[13]  DJF refers to the Division of Juvenile Facilities, a division of the Department of Corrections and Rehabilitation.  (See Welf. & Inst. Code, § 733.)  DJJ refers to the Division of Juvenile Justice, the current name for the former California Youth Authority.  (See *In re Jose T*. (2010) 191 Cal.App.4th 1142, 1145, fn. 1.)

[14]  The Riverside County Office of Education submitted an amicus brief urging us to disregard the ALJ's decision.  We appreciate the RCOE's contribution, but our resolution turns on an independent ground.

32

As to our first basis for denying the request, we agree with the People that a discretionary decision of a lower court should be evaluated on the basis of evidence actually before the court at the time of the decision. (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1108 [Fourth Dist., Div. Two], citing *People v. Sanchez* (1995) 12 Cal.4th 1, 59, fn. 5 [overruled on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421]; see also *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 [reviewing courts generally do not take judicial notice of evidence not presented to the trial court].)

Even if it were appropriate to take judicial notice of the OAH decision, such notice would be limited. We can take judicial notice of official acts and public records, but we cannot take judicial notice of the truth of the matters stated therein. (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063-1064, overruled on a different point by *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276; see also, *People v. Castillo* (2010) 49 Cal.4th 145, 157.) Thus, even if we took judicial notice that the OAH issued a decision on January 24, 2014, we could not take judicial notice of what was stated in that opinion.

As to our second and third bases for denial of the request, the information in the OAH decision was cumulative. At the disposition hearing, the court heard testimony of DJJ witnesses called by the prosecution, as well as the testimony of Dr. Jose Fuentes, a neuropsychologist who assessed Joseph at the request of the RCOE in connection with Joseph's IEP. After the People rested, the defense indicated it had no witnesses, and rested. Because Joseph's educational needs were but one of the concerns at the

33

disposition hearing, the decision of the OAH on the subject of the minor's educational needs was cumulative of information already before the court.

b.       *Considering All of Joseph's Needs, the Court Properly Exercised Its Discretion.*

Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. (Welf. & Inst. Code, § 202, subd. (b).) This guidance may include punishment that is consistent with the rehabilitative objectives of the Juvenile Court Law. (*Ibid.*)

When determining the proper disposition for a minor who has been found to be a delinquent, the court must consider (1) the minor's age, (2) the circumstances and gravity of the offense, and (3) the minor's previous delinquent history. (Welf. & Inst. Code, § 725.5; *In re Greg F.* (2012) 55 Cal.4th 393, 404.) Additionally, there must be evidence in the record demonstrating both a probable benefit to the minor by a Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF) commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 485.) In fact, no ward of the juvenile court shall be committed to the DJF unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable he will be benefited by the reformatory educational discipline or other treatment provided by DJF. (Welf. & Inst. Code, § 734; *In re Edward C.* (2014) 223 Cal.App.4th 813, 829.)

34

A minor who has committed an offense described in subdivision (b) of Welfare & Institutions Code section 707, may be committed to the DJF unless he or she is otherwise ineligible for commitment to the division under Welfare & Institutions Code, section 733. (Welf. & Inst. Code, § 731, subd. (a)(4).)  A ward is ineligible for commitment to the DJF if (a) the ward is under 11 years of age; (b) the ward is suffering from a contagious or infectious disease that would endanger the lives or health of other inmates; or (c) the most recent offense charged in any petition is not described in subdivision (b) of Welfare & Institutions Code section 707, or subdivision (c) of section 290.008.  (Welf. & Inst., Code, § 733.)  Joseph was eligible for commitment.

We review a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision.  (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.)  A decision to commit a minor to the DJF does not constitute an abuse of discretion where the evidence demonstrates probable benefit to the minor from the commitment to DJF and that less restrictive alternatives would be ineffective or inappropriate.  (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.)

The minor contends the court did not consider all residential treatment center alternatives, including "several possible in-state and out-of-state placement options."  The minor also challenges the juvenile court's findings that a DJF commitment would be of probable benefit to him due to his educational needs.  Focusing exclusively on the minor's rights to a "Free and Appropriate Public Education" (FAPE) and Individuals with Disabilities Education Act (IDEA) (Ed. Code, §§ 56150, 56000, subd. (a)), the minor argues that DJF was an unsuitable placement because the Administrative Law Judge's

opinion showed Joseph's IEPs failed to identify the correct accommodations and services he needs. Yet, the court did not have the Administrative Law Judge's opinion to consider at the time of the order. It heard testimony that the DJF school where Joseph would be educated provides IEP and special education services comparable to the services available in the public sector schools. The minor did not present any evidence to the contrary, and the only alternative placements suggested at the hearing were unsecured placements which were unacceptable.

A commitment decision, especially a decision involving a minor with multifarious complex problems of low-average intelligence, aggressive and assaultive behavior, ADHD, and a history of abuse and neglect, who has been found to have committed an act which would be murder if he were an adult, cannot be driven by one problem. While the minor was entitled to a Free and Appropriate Public Education (FAPE), as well as special education services pursuant to the Individuals with Disabilities Education Act (IDEA), the educational needs of the child are not the only issue before the court. Providing a child with an appropriate education as part of the treatment and rehabilitative services provided by DJJ/DJF, so any commitment to such a facility necessarily includes services for any special educational needs (see *In re Angela M., supra,* 111 Cal.App.4th at p. 1398, fn. 6), among other important considerations.[15] The minor's special education

---

[15] At oral argument, counsel for RCOE requested that we clarify that an educational placement under IDEA is not the same as a placement under the Juvenile Court Law. In juvenile court proceedings, the court orders commitments to DJJ/DJF, rather than placements, so clarification is unnecessary. More significantly, this issue was not before the juvenile court, so it is not properly before us.

needs did not trump other factors the court was required to weigh in making its commitment decision.

The juvenile court heard testimony from Dr. Fuentes, the neuropsychological expert hired by the Office of Education, along with other evidence relating to his history of aggressive, assaultive, and violent behavior, his problems with impulse control, his distractibility, as well as his need for special education. The court also considered five reports, pursuant to the parties' stipulation, as well as the DJJ compliance and oversight reports.

The testimony adduced at the contested disposition hearing (at which the minor did not present any witnesses) also showed that the minor had greatly improved cognitively while detained in juvenile hall, and had progressed academically. Further, the minor reported that he liked it at the DJJ. Dr. Fuentes felt that the minor would have difficulty managing behaviors and emotional control outside a highly structured environment. To Dr. Fuentes, "least restrictive placement" meant the most normalized educational setting, which could be in a penal institution. He indicated Joseph needs services for socially emotional needs, counseling with language pragmatics, without which his ability to access education would be impeded. However, Dr. Fuentes also testified that Joseph requires supervision; it was not safe for either him or the public to be released into the community.

The court also heard evidence that DJJ could provide the special education services recommended by Dr. Fuentes, and could meet his mental and emotional needs. All other secured facilities had rejected Joseph due to the level of his offense, his age, or

37

his special needs, except for Copper Hills Youth Center in Utah. The probation officer did not recommend a commitment to that facility because it had accepted Joseph on the recommendation of an official with DMH, without interviewing Joseph. Yet, the defense did not present any testimony from a representative of Copper Hills to assuage any of the probation officer's reservations, or to persuade the juvenile court that it was an appropriate placement. Further, at the dispositional hearing, the minor did not ask the court to consider placement at Copper Hills. The minor cannot complain that the court rejected Copper Hills as an alternative placement.

Notwithstanding the complexity of this case, and the problems confronting Joseph, the record before us demonstrates that the trial court nevertheless considered all the evidence presented, addressed of the issues, and properly exercised its discretion to commit Joseph to DJF. On this record, that discretion was not abused.

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.


We concur:

McKINSTER
J.

CODRINGTON
J.

38