Filed 8/6/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br> Plaintiff and Respondent,<br><br>v.<br><br>A.M.,<br><br> Defendant and Appellant. | A154878<br><br>(Contra Costa County<br>Super. Ct. No. J16-00562) |

In *In re Carlos J.* (2018) 22 Cal.App.5th 1, we held that a juvenile court's order committing a minor to the Department of Juvenile Facilities (DJF)[1] must be supported by "*some* specific evidence in the record of the programs at the DJF expected to benefit a minor." (*Id.* at p. 10.) Because there was "no specific information in the record regarding the programs at the DJF" in that case, we reversed the commitment order. (*Id.* at p. 4.) In the instant case, A.M. (Minor) relies on *In re Carlos J.* to challenge the juvenile court's order committing him to the DJF. In contrast to *In re Carlos J.,* the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III and IV.

[1] "As of July 1, 2005, the correctional agency formerly known as the Department of the Youth Authority (or California Youth Authority) became known as the 'Department of Corrections and Rehabilitation, Division of Juvenile Facilities.' ([Welf. & Inst. Code,] § 1710, subd. (a).)" (*In re Carlos J., supra,* 22 Cal.App.5th at p. 4, fn. 2.)

People presented testimony by a DJF official about the programs offered by DJF, and introduced into evidence DJF publications further describing the programs. We affirm the juvenile court's dispositional order.

## BACKGROUND

In October 2017, a Welfare and Institutions Code[2] section 602 petition was filed alleging Minor (then age 16) committed murder, and Minor subsequently admitted the allegation. According to the police and probation reports, in September 2017, Minor drove his older brother to a park, knowing that his brother intended to kill someone there. After dropping his brother off, Minor drove to a market where he changed his clothes and called his brother. The car driven by Minor was registered to Minor's girlfriend, A.A. In text messages between Minor and A.A. sent two days after the shooting, A.A. writes, "Babe my mom sayin that to change the name of the car or she gone tell [Minor's mother] about what [Minor's brother] did." Minor responded, "tell her to stop threatening," "if she snitches sorry babe," and "I'm not gunna go doing for sum stupid ass lady that thinks she can threatening us and think its all good." Minor's brother admitted to police that he shot the victim, told Minor what he was going to do before Minor drove him to the park, and was picked up near the park after the murder. Minor admitted to police that his brother told him he was going to kill the victim, Minor picked him up and drove him to the park, and he drove through the park while his brother looked for the victim.

*The People's Disposition Evidence*

*Probation Report*

Before his arrest, Minor lived with his parents, 8-year-old brother, and 19-year-old brother and co-responsible, and had a good relationship with his parents and brothers. He had generally good attendance at the high school he was attending before his arrest and was a senior with a 1.54 grade point average. During Minor's detention in juvenile hall since his arrest, he had achieved "gold level, the highest possible level," and staff

---

[2] All undesignated section references are to the Welfare and Institutions Code.

reported he exhibited "pro-social behavior" and exceeded behavioral expectations. He was a peer helper and volunteered with the bible study leader. In an interview with the probation officer, Minor denied gang affiliation and substance abuse, anger management, medical, or psychological issues.

Minor had previously been declared a ward in February 2017 for misdemeanor second degree commercial burglary (Pen. Code, §§ 459, 460, subd. (b)) and receiving stolen property (Pen. Code, § 496, subd. (a)). Minor had been placed on 60 days home supervision with probation conditions, and subsequently violated his probation conditions by being in contact with A.A. despite a no-contact order, driving without a license, and possessing drugs. The probation report noted that during his wardship, Minor was provided with rehabilitative services, including individual and family counseling, but despite these services Minor committed the instant offense. The report also noted that in the instant offense, Minor played an active role in both the offense and subsequent efforts to avoid being caught.

The probation report concluded there was "a low likelihood the minor can be successfully rehabilitated in any of the least restrictive options available through probation" in light of his "delinquent history, his lack of compliance with the terms and conditions of his current wardship and term of probation, and the gravity of the current offense." Instead, Minor required "intensive services . . . , which is a substantial time removed from the community and his family. [Minor] needs to participate in programming and treatment where he will learn to think before he acts and foresee potential consequences of his behaviors. The services offered at [the DJF] in terms of interventions and treatment will assist [Minor] . . . ." Accordingly, the probation report recommended commitment to the DJF.

*Evidence Regarding DJF*

Jocelyn Montano, an intake and court liaison employee with the DJF, testified at the disposition hearing. Montano testified that, when she began working for the DJF in 1994, the agency had 10,000 youth in custody. She described reforms that were implemented as the result of a lawsuit, including reducing the number of youths in

3

custody (the current number was approximately 620), welfare and safety reforms, and implementing "evidence-based practices." Montano acknowledged that there are still fights between youth at the DJF, but the fights were primarily "simply because they're teenagers," rather than being gang related.

Montano described the procedure after a youth is committed to the DJF. First, there is a 45- to 60-day intake and orientation period. As described in a DJF publication admitted into evidence, the intake process includes a gang interview; mental health, medical, and academic evaluations; multiple psychological diagnostic tests; and a psychosocial assessment. The DJF also administers a screening tool created for the DJF to identify the needs of incoming youth. Following these evaluations and assessments, an "individualized treatment program" is created. The individualized treatment program "drives everything" with respect to a youth's placement. The programs are overseen by treatment teams led by youth counselors, who carry caseloads of between three and five youths. The treatment team also includes a teacher, psychologist, case work specialist, and possibly others, such as a work supervisor. Every 90 to 120 days, individualized programs are reviewed and, if necessary, changed.

The treatment programs include a "core program," with three levels depending on the youth's level of need. Youths participate in group sessions with the other youths assigned to their youth counselor. Other treatment available to youth at the DJF includes impulse control therapy, anger management programs, individual therapy, and the "CounterPoint" program to help youth "identify negative peers" and "gain the positive skills needed to live a healthy and pro-social lifestyle." The DJF administers special treatment units for sex offenders and youths with mental health needs. Family members can visit on weekends and can participate in family counseling in person or telephonically.

Pursuant to DJF regulations, a youth adjudicated on a murder charge would be eligible for discharge from the DJF seven years after commitment or when the youth turns 23, whichever comes first.

4

Other than testifying that Minor's murder adjudication renders him eligible for DJF placement, Montano did not discuss Minor's needs or what DJF programs would be appropriate. She had not reviewed the probation report or talked to Minor or his family.

*Evidence Regarding YOTP*

Probation officer Kira Faulkner testified about the Youthful Offender Treatment Program (YOTP) located in juvenile hall. YOTP offers various treatment including cognitive behavior, aggression replacement, substance abuse, and therapy. As described in a probation publication, minors committed to YOTP are ordered into custody for the maximum custody time or until they turn 21, whichever comes first, but their actual time in custody will depend on when they complete the custodial phases of the program. Faulkner testified that the average time a minor committed to YOTP spends in custody is nine to ten months.

Faulkner, who screened minors for placement at YOTP, opined that the program was not appropriate for Minor in part because "evidence-based practices work best when you have youth that have committed similar offenses because it is that offense that they must discuss throughout their treatment time at the YOTP," and "there are no other youth that have committed a murder on the unit as it stands." In contrast, "there are youth at the [DJF] that have committed similar crimes. And with their evidence-based practices, . . . it would work better for him because he is going to be surrounded by other youth that . . . have committed similar offenses. And they will understand each other better than what we can offer at the YOTP."

*Minor's Disposition Evidence*

Minor presented the testimony of social worker Erin Brown, an expert in forensic social work. Brown spent approximately eight hours with Minor, met with his parents and younger brother, and spoke to a number of service providers and teachers. Minor's parents reported that he "did what he was supposed to do, wasn't rebellious, was helpful." In contrast, Minor's parents described his older brother as "explosive and aggressive" and reported that he teased and was "intimidating" to Minor when they were

5

younger.  Brown testified that Minor did not appear to have insight into how his older brother's behavior affected him and he could gain this insight in treatment.

At Minor's counsel's request, Brown did not talk to Minor about the offense.  He did tell her that taking another life is "never acceptable" and expressed empathy for the victim's family.  Several people who worked with Minor told Brown that he mentored other youth, and Minor's teachers told Brown that Minor was "very respectful," they were "shocked when they learned about the offense," and Minor's brother was "trouble" but Minor was "really loyal to him."  Minor's goals were to graduate from high school, take college classes, "get training in a career and have a job and contribute to this family," and eventually marry his girlfriend and start his own family.

Brown opined that the DJF was not suitable for Minor because "he would be exposed probably to individuals who . . . have a longer history of delinquency," and placing a youth like Minor, who is not "an entrenched delinquent," with youths "who have more experience, more violence in their history" would be "potentially detrimental."  Brown specifically noted "[t]here is a lot of pressure there to participate actively in gangs, . . . [a]nd resistance to that can result in being targeted."  Minor "doesn't have a history of fighting. . . . I don't know that he has the strength to survive a program like that, to be frank."  Brown opined that Minor's strong performance in juvenile hall—which also houses YOTP—and the smaller setting available in YOTP make Minor an appropriate candidate for YOTP.

Minor also submitted letters of support from former service providers, supervisors, and teachers, who described him as having "a wonderful, kind attitude," "a respectful and hardworking individual"; "easygoing, affable, funny, and particularly caring"; and "a young man of sound moral character" with "a good heart."  He provided letters from both his parents and numerous relatives.  Minor also wrote a letter to the juvenile court, stating he was "very sorry about what happened" and felt "remorse and empathy toward the family" of the victim.

*Juvenile Court's Ruling*

The juvenile court noted that Minor "can be a very likable, affable individual" and the court was "impressed with the number of letters that have been submitted on your behalf," which indicate he has "tremendous potential." However, the court contrasted the text messages Minor sent to his girlfriend with the descriptions in the letters of support: "[T]he only reasonable interpretation of those texts is a threat that was made to your girlfriend's mother. And it's really troubling to me because it stands in such contrast . . . to the person that the teachers write about, that the therapists write about." Moreover, Minor's performance on probation—"routinely and regularly seeing your girlfriend in spite of a court order that there be no contact," "driving without a license," "possessing marijuana," and "participating in and committing this murder"—indicated "that the [Minor] that perhaps the family knows is not necessarily the [Minor] that was operating in the community when he was outside the home."

The court queried, "where on earth were your parents," who "knew what the conditions of your probation were" but "apparently . . . didn't see fit to enforce any of those orders or to hold you accountable when you violated those orders." The court concluded that neither Minor nor the community would be safe if Minor remained in the parents' home. The court similarly concluded placement in a group home "would not meet the needs of [Minor], nor would it keep the community safe."

With respect to YOTP, the juvenile court reasoned: "it's a program with phases. And those phases are based on the treatment and the doses of treatment and how long it takes to progress through those doses of treatment. [¶] In my view, if I were to say, oh, you're going to be in YOTP for two years, it really defeats the purpose of YOTP, and it serves little purpose other than just saying, well, I want you locked up for that period of time, so I'm just going to keep you at YOTP even though you've completed all the programming. There's not much more that can be offered once you've completed the custodial phases of YOTP."

Instead, the juvenile court concluded, the DJF was the most appropriate commitment: "When you look at the gravity of this offense, and you look at the

7

sophistication in which it was carried out, and I do believe it was sophisticated, I believe the driving around, looking for the victim in the parking lot, the movement of the car after dropping the brother, the changing of clothes, all of that demonstrates a level of sophistication, is such that the gravity of this offense makes a [DJF] commitment most appropriate." The court committed Minor to the DJF.

DISCUSSION

I. *Legal Background*

" 'We review the [juvenile] court's placement decision for an abuse of discretion. [Citation.] We review the court's findings for substantial evidence, and " '[a] trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence.' " ' " (*In re Carlos J., supra,* 22 Cal.App.5th at p. 5.)

" ' " 'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.' " ' " (*In re Carlos J., supra,* 22 Cal.App.5th at p. 5.) " ' "[O]ne of the primary objectives of juvenile court law is rehabilitation, and the statutory scheme contemplates a progressively more restrictive and punitive series of dispositions starting with home placement under supervision, and progressing to foster home placement, placement in a local treatment facility, and finally placement at the [DJF]. [Citation.] Although the [DJF] is normally a placement of last resort, there is no absolute rule that a [DJF] commitment cannot be ordered unless less restrictive placements have been attempted." ' [Citation.] A juvenile court may properly consider 'a restrictive commitment as a means of protecting the public safety.' " (*Id.* at pp. 5–6.)

"In order to ensure the necessity of a DJF placement, there must be evidence 'supporting a determination that less restrictive alternatives are ineffective or inappropriate,' " as well as " '[substantial] evidence in the record demonstrating . . . a probable benefit to the minor by a [DJF] commitment . . . .' [Citations.] That is because section 734 provides that 'No ward of the juvenile court shall be committed to the [DJF] unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the

8

reformatory educational discipline or other treatment provided by the [DJF].' [¶] Evidence of probable benefit is required not only by section 734, but also by the language of section 202, subdivision (b) mandating that delinquent minors 'receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances.' (§ 202, subd. (b).) A similar mandate appears in rule 5.790(h) of the California Rules of Court.[3] That rule provides that, where a minor's welfare requires that he be removed from his parent's custody (§ 726, subd. (a)(3) ) . . . , '[t]he decision regarding choice of placement must take into account . . . [t]hat the setting is the environment best suited to meet the child's special needs and best interest.' (Rule 5.790(h).)" (*In re Carlos J., supra,* 22 Cal.App.5th at p. 6.)

In *In re Carlos J.,* this court recently held that, "[i]n order for a juvenile court to make the determination of probable benefit required by section 734; the determination of 'appropriate' treatment in a minor's 'best interest' required by section 202, subdivision (b); and the determination of whether the DJF is 'best suited' to meet a minor's 'special needs and best interest' required by rule 5.790(h), there must be *some* specific evidence in the record of the programs at the DJF expected to benefit a minor." (*In re Carlos J., supra,* 22 Cal.App.5th at p. 10.) We reversed the juvenile court's DJF commitment because there was "no specific information in the record regarding the programs at the DJF . . . ." (*Id.* at p. 4.) We explained that, although the probation report identified the minor's need for a " 'facility that can offer gang intervention services,' " the report contained "no information about the nature of the gang intervention services [offered at the DJF], in order to allow the juvenile court (and this court on review) to make an assessment of the appropriateness and adequacy of the programs for appellant." (*Id.* at p. 11.) Similarly, the juvenile court acknowledged the minor's need for mental health services, but "the court had no information before it regarding any mental health services at the DJF." (*Ibid.*) We acknowledged that juvenile courts, probation officers, and

---

[3] All undesignated rule references are to the California Rules of Court.

attorneys practicing in juvenile court "frequently participate in placement determinations and have some knowledge of the programs at the DJF and other placements. It may be reasonable in such circumstances for participants in the proceedings to speak in 'shorthand' about placements and other matters. Nevertheless, judicial review *by this court*, requires some concrete evidence in the record about relevant programs at the DJF. Otherwise, this court's review for substantial evidence is an empty exercise, not meaningful appellate review of a legal proceeding resulting in commitment of a minor to the DJF." (*Id.* at pp. 11–12.)

We offered guidance about "the *initial* showing required to support a DJF commitment," to wit, "the probation department, in its report or testimony, [should] identify those programs at the DJF likely to be of benefit to the minor under consideration. Where a minor has particular needs, the probation department should also include brief descriptions of the relevant programs to address those needs." (*In re Carlos J., supra,* 22 Cal.App.5th at p. 12.) However, "the probation department is not required in its report and initial testimony to provide in-depth information about the DJF's programs or to preemptively respond to even predictable criticisms of the DJF. Under Evidence Code, section 664, where the probation officer has identified programs of benefit to a minor and provided brief information about the most important programs, it may be presumed the probation officer's recommendation is based on an assessment the programs are available and appropriate. If a minor wishes to dispute the availability or efficacy of particular programs, or to suggest that other conditions at the DJF undermine the programs, the minor must present sufficient evidence to reasonably bring into question the benefit he or she will receive from the adoption of the probation department's recommendation." (*Id.* at p. 13.) Upon such a showing, the People would be obligated "to present more in-depth information about the DJF in order to show probable benefit." (*Id.* at p. 14.)

II. *Probable Benefit of DJF Commitment*

We begin by highlighting the stark contrast between *In re Carlos J.* and this case. In *In re Carlos J.,* there was "*no* specific information in the record regarding the

10

programs at the DJF." (*In re Carlos J., supra,* 22 Cal.App.5th at p. 4, italics added.) Here, the People presented lengthy testimony from a DJF official about the programs offered at the DJF, as well as DJF publications describing various programs.

Minor nonetheless contends the evidence was insufficient. As an initial matter, he complains that the DJF witness "knew nothing particular about [Minor]." The DJF witness testified about the programs offered at the DJF. The People presented information about Minor and his needs through other evidence, to wit, the probation report. The juvenile court could, based on all of this evidence, determine whether it was probable that a DJF commitment would benefit Minor. It was not necessary for the DJF witness to know particulars about Minor.

Minor next argues the DJF programs described in the record did not "relate[] to [Minor] or his 'critical needs.' " To be sure, some of the programs were not relevant, for example, treatment for sex offenders. However, the juvenile court could reasonably find that other DJF programs would benefit Minor: group sessions with other youths, a program to help identify negative peers, impulse control therapy, anger management, and/or individual therapy. Minor's position appears to be that he has no need for any of these programs at all, based on the descriptions in the letters from his family and others. The juvenile court found otherwise, discounting those descriptions as irreconcilable with the nature and circumstances of the offense and with Minor's performance on probation. Substantial evidence supports this finding.

Accordingly, there is ample "specific evidence in the record of the programs at the DJF expected to benefit [Minor]." (*In re Carlos J., supra,* 22 Cal.App.5th at p. 10.) The juvenile court's finding of a probable benefit to Minor from a DJF commitment is supported by substantial evidence.

III. *Less Restrictive Options*

Minor next challenges the juvenile court's finding that the less restrictive option of YOTP would have been inappropriate or ineffective.

Minor argues YOTP offered programming similar to the DJF. Even assuming similarities between the relevant programs offered, there was evidence that the treatment

11

at YOTP would be less effective because the other youths had not committed comparable crimes.[4]  More significantly, the juvenile court determined that Minor required a longer term of confinement than the average term of nine to ten months for YOTP participants, but that committing him to YOTP with a longer term of confinement would not be appropriate because, once he completed YOTP, he would no longer be receiving treatment.[5]  Contrary to Minor's suggestion, the juvenile court could reasonably conclude that, even if Minor successfully completed YOTP's custodial components, he would still be a threat to public safety and should not be released.

IV. *Additional Contentions*

Minor challenges three of the juvenile court's findings.  First, he argues the juvenile court unreasonably found Minor's parents "were to blame" and relied on this finding to select the DJF instead of YOTP.  Although the juvenile court did find Minor's parents failed to adequately supervise him—a finding amply supported by substantial evidence—the court relied on this finding to determine that Minor could not safely remain in his parents' home, not to reject YOTP in favor of the DJF.  The finding thus has no bearing in this appeal.

Minor next contends the juvenile court unreasonably found his offense "sophisticated" and thereby warranting a DJF commitment.  Contrary to Minor's characterization of the offense, his participation was more than "the mere dropping off of the shooter a distance from the shooting": there was evidence that he drove his brother around the park looking for the victim, changed clothes after the killing to evade

---

[4] Minor argues this evidence was in conflict with Faulkner's testimony that YOTP accepts a mix of moderate- and high-risk youth.  However, the risk level Faulkner was referring to was risk of reoffending, which is distinct from the offense committed (although the offense may impact the risk of reoffending).  The testimony is therefore not conflicting.

[5] Minor argues the juvenile court did not understand that it could release Minor from custody after he completed YOTP.  The juvenile court plainly understood its authority to do so, but determined that Minor required a longer term of confinement than the average time taken to complete YOTP.

detection, and issued threats to his girlfriend's mother to keep her from telling others about the offense.  Substantial evidence supports the juvenile court's finding that the circumstances of Minor's offense supported a DJF commitment.

Finally, Minor argues the juvenile court unreasonably found his text messages were threats.  Minor's texts to his girlfriend about her mother—"tell her to stop threatening," "if she snitches sorry babe," and "I'm not gunna go doing for sum stupid ass lady that thinks she can threatening us and think its all good"—can reasonably be construed as threatening that, if his girlfriend's mother "snitches," he will retaliate against her.

DISPOSITION

The judgment is affirmed.

13

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

(A154878)

Contra Costa Superior Court, No. J1600562, Hon. Rebecca C. Hardie, Judge.

Richard Such & L. Richard Braucher, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Eric D. Share and Huy T. Luong, Deputy Attorneys General, for Plaintiff and Respondent.