Filed 11/17/20  In re D.H. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re D.H., a Person Coming Under the Juvenile Court Law | B297239 |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>D.H.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. FJ54217) |

APPEAL from an order of the Superior Court of Los Angeles County, Robert Leventer.  Affirmed with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jonathan J. Kline and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

D.H. appeals from the juvenile court's disposition order committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice, now known as the Department of Youth and Community Restoration (the Department),[1] for a maximum term of five years eight months, after the court found D.H. violated the terms and conditions of his probation under Welfare and Institutions Code section 777.[2] D.H., who was 15 years old at disposition, argues the juvenile court abused its discretion in committing him to the Department because there were "less restrictive alternatives that could have met [his] needs while at the same time meeting the court's legal obligation to place [him] in the least restrictive environment." D.H. also argues, and the People concede, the juvenile court erred in calculating his predisposition custody credit. We direct the juvenile court to correct D.H.'s predisposition custody credit, but otherwise affirm.

---

[1] Effective July 1, 2020 the Legislature removed the Division of Juvenile Justice from the Department of Corrections and Rehabilitation and reestablished it as the Department of Youth and Community Restoration under the Health and Human Services Agency. (Gov. Code, §§ 12820, 12821, added by Stats. 2019, ch. 25, § 20.)

[2] Undesignated statutory references are to the Welfare and Institutions Code.

# PROCEDURAL AND FACTUAL BACKGROUND

A.     *The Prior Petitions Under Section 602*

D.H.'s extensive criminal history began in October 2016 when he was 13 years old.  By October 2017 the juvenile court had declared D.H. a ward of the court, removed him from his parent's custody, and sustained four section 602 petitions charging D.H. with numerous offenses.  Those offenses included burglary, attempted robbery, robbery, theft, possession of burglary tools, attempted carjacking, carjacking, evading a peace officer, theft of a vehicle, receiving stolen property, presenting false identification, and driving without a license.  During 2017 the juvenile court made multiple orders for suitable placement, including orders placing D.H. in a group home, a community detention program,[3] and juvenile hall.  On November 21, 2017 the juvenile court ordered D.H. "home on probation."

Two months later, on January 23, 2018, police officers saw a car driven by someone who was not wearing a seatbelt.  D.H., who was sitting in the front passenger seat, "look[ed] nervously" at them.  The officers followed the car and saw a gun on the ground at an intersection the car had just crossed.  They ordered the driver to stop, told the occupants to get out, and called for another officer to retrieve the gun from the street.  Officers located a second gun near a sidewalk.  Both guns were loaded.  The officers took D.H., the driver, and another passenger to the police station for further investigation, where the driver told the officers he saw D.H. throw a gun out the window.

---

[3]     Community detention, also known as house arrest, required D.H. to wear an ankle monitor.

The People filed a petition under section 602 charging D.H. with possession of a firearm and possession of live ammunition by a minor (Pen. Code, §§ 29610, 29650). D.H. admitted both allegations, and the juvenile court sustained the petition. The court set a disposition hearing for April 26, 2018.

On February 24, 2018 D.H. and four other minors entered a department store, stole several "high-end" purses, and fled in a car driven by D.H., who led police officers on a brief pursuit before stopping. The People filed a petition under section 602 charging D.H. with grand theft (Pen. Code, § 487, subd. (a)), conspiracy to commit a crime (Pen. Code, § 182, subd. (a)(1)), and driving without a license (Veh. Code, § 12500, subd. (a)). After D.H. admitted the conspiracy allegation, the juvenile court sustained the petition, dismissed the other two allegations, and set the case for disposition.

On March 19, 2018 D.H. entered a department store, took clothing off the shelves, walked past the registers, and tried to leave. When two store employees confronted him, D.H. punched one of them in the face. When police officers arrived, they took D.H. into custody and transported him to juvenile hall. The People filed another section 602 petition, the third in three months, charging D.H. with two counts of robbery (Pen. Code, § 211). After D.H. admitted one of the counts, the juvenile court sustained the petition, dismissed the second robbery count, and set the matter for disposition.

At the April 26, 2018 disposition hearing, the parties submitted on the recommendation of a camp community placement program. The juvenile court ordered D.H. to camp for seven to nine months and told him: "And so you understand what is happening, these are serious crimes. I got to get through

4

to you somehow because you will end up in prison the rest of your life. . . . I handle all the kids who go to [the Department]. You are headed in that direction. You need to turn this around. These are robberies, not just one. A possession of a gun. This is serious business. You are eligible for [commitment to the Department] today. Seven to nine months [of camp] is a break."

While at camp, D.H. received six suspensions for, among other things, attempted robbery, gang activity, and assault in a "mutual fight." D.H. was released from camp on December 6, 2018 and again placed home on probation.

B.    *The Current Petition Under Section 602*

On December 21, 2018, two weeks after his release from camp, D.H. and four other minors entered two department stores and stole several items. D.H. again drove the getaway car. Police officers responding to a "theft in progress" call tried to pull over the car D.H. was driving. D.H. drove away and led police on a 10-mile high-speed chase on the freeway in "opposing traffic lanes" and on side streets during rush hour while throwing the stolen items out the car window. The police officers eventually conducted a "PIT maneuver,"[4] which caused D.H. to crash his car into a police car as he tried to make an illegal U-turn. The officers detained D.H. and took him to juvenile hall. The People filed another petition under section 602, charging him with fleeing to elude a pursuing peace officer in a vehicle driven in

---

[4]    A PIT, or "pursuit immobilization technique" (*Weaver v. State of California* (1998) 63 Cal.App.4th 188, 194), is a technique "where a police vehicle accelerates into the rear side of the fleeing vehicle, pushing it and causing it 'to spin out of control.'" (*People v. Bell* (2009) 179 Cal.App.4th 428, 433.)

willful or wanton disregard for the safety of persons or property (Veh. Code, § 2800.2), three counts of second degree burglary (Pen. Code, § 459), two counts of grand theft (Pen. Code, § 487, subd. (a)), and possession of burglary instruments or tools (Pen. Code, § 466). The People subsequently filed a notice of probation violation under section 777 in lieu of the petition, and the juvenile court dismissed the petition and set a probation violation hearing.[5]

C.     *The Probation Violation Hearing, Disposition, and Commitment to the Department*

At the probation violation hearing D.H. admitted that his conduct on December 21, 2018—failing to yield to police and driving recklessly—violated the terms and conditions of his probation. The juvenile court found D.H. in violation of probation and sustained the allegation in the section 777 notice.

The probation officer, testifying at disposition, recommended placing D.H. in a suitable facility in Iowa for a six- to 12-month program. The juvenile court asked the probation officer why he believed it was not appropriate for the court to commit D.H. to the Department. The probation officer said the court should give D.H. "another opportunity" in a place where he could "start over" and gain a new perspective. The probation officer stated that juvenile offenders like D.H. view the

---

[5]     "[A] probation violation procedure is initiated under section 777 by the filing of a *notice*, not a petition. [Citation.] Significantly, a probation violation proceeding involves a different standard of proof than a section 602 proceeding, and it does not result in the charging or adjudication of a criminal offense, even if the conduct alleged is criminal." (*In re Greg F.* (2012) 55 Cal.4th 393, 405.)

6

Department as a "prison" and a "place of no hope" and that it is particularly difficult for juveniles to rehabilitate in a setting where they know each other and their "past transgressions." When the court asked the probation officer whether the Iowa facility was a "locked facility," the probation officer said that he thought it was, but that he could be wrong.

The prosecutor asked whether there were any differences in programming between the Department and the Iowa facility, and the probation officer stated that "they offer the same services." When asked whether the Department's rehabilitative programs were "just as good" as any out-of-state program, the probation officer responded, "Possibly, yes." Neither the probation officer nor counsel for D.H. suggested a different placement.

The prosecutor argued that the Department had "an excellent program" and that, given D.H.'s "escalating criminal behavior," commitment to the Department was "the natural next step" and "best outcome in this case." Counsel for D.H. stated that, although the Department could be "a positive influence," D.H. would still be "around the people who know him." Counsel for D.H. argued that commitment to the Department was "not warranted" because the juvenile court had previously dismissed several allegations against D.H., including the current section 602 petition, and that the conduct that violated D.H.'s probation, while dangerous, was "an immature act."

The juvenile court stated: "I have known [D.H.] for quite a while. And we have tried lots of different ways to keep him from committing crimes, and we have been unsuccessful. We have tried electronic surveillance. We have tried home-on probation. We have tried suitable placement. We have tried camp. Right

7

after he gets out of camp he is . . . on this high speed chase which is quite horrific. . . . I have no reason to believe that the Iowa placement is a locked facility. Nor do I believe that getting him away from people he knows would be a justification for authorizing an out-of-state placement, nor keeping him away for six months or even a year . . . in light of the fact that there are victims out there and there is a potential for people getting killed . . . . He has shown a total disregard for the law and for other people's well-being. He presents a danger."

The juvenile court also stated, "I believe that [the Department] does offer an appropriate program and does have services. . . . I have looked at the programs and the description of the programs that counsel have provided. . . . I believe [the Department] does have appropriate programs, vocational programs, counseling programs, and that [D.H.] can benefit from those programs, if he chooses to." The court stated that juveniles sent to the Department "do progress," "do get better," and go on to "make good decisions." The court said to D.H., "If you want to do good, you do. . . . If you want to benefit from the program, you can." The juvenile court also stated it would inform the Department of any special educational needs D.H. may have.

For violating probation on the robbery adjudication, the court committed D.H. to the Department for a term not to exceed five years. For violating probation on the firearm possession adjudication, the court committed D.H. for a term of eight months. The court awarded D.H. 301 days of predisposition custody credit. D.H. timely appealed.

# DISCUSSION

### A.    *The Juvenile Court Did Not Abuse Its Discretion in Committing D.H. to the Department*

D.H. argues the juvenile court abused its discretion in committing him to the Department because, according to D.H., the court did not adequately "consider less restrictive alternatives" to placement with the Department or make a finding that commitment to the Department would "provide a probable benefit" to D.H.  D.H. contends that the "store thefts," which were the bases of his commitment, were "crimes of youth and poverty," that the Department is "reserved for the worst of the worst," and that it is "unclear why his needs could not be met at less restrictive placements."  The record does not support D.H.'s contentions, nor does it show the juvenile court abused its discretion.

### 1.    *Applicable Law and Standard of Review*

"'There is no "sentence," per se, in juvenile court.  Rather, a judge can impose a wide variety of rehabilitation alternatives after conducting a "dispositional hearing," which is equivalent to a sentencing hearing in a criminal court.'" (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 306.)  "When determining the proper disposition for a minor who has been found to be a delinquent, the court must consider (1) the minor's age, (2) the circumstances and gravity of the offense, and (3) the minor's previous delinquent history." (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 542; see § 725.5; *In re Jonathan T.* (2008) 166 Cal.App.4th 474, 484-485.)  "Because rehabilitation is one of the primary objectives of juvenile court law, our statutory scheme

"'contemplates a progressively more restrictive and punitive series of dispositions starting with home placement under supervision, and progressing to foster home placement, placement in a local treatment facility, and finally placement at [the Department].'"" (*In re N.C.* (2019) 39 Cal.App.5th 81, 85-86; see § 202, subd. (e).) Where a probation violation under section 777 "is established, the most restrictive placement the court can impose is the maximum term of confinement on the original offense for which the ward was placed on probation." (*In re Greg F.* (2012) 55 Cal.4th 393, 405.)

"[A]nother primary objective of juvenile court law is to protect public safety. . . . However, 'to ensure the necessity of [Department] placement, there must be evidence "supporting a determination that less restrictive alternatives are ineffective or inappropriate." [Citation.] More importantly . . . "there must be [substantial] evidence in the record demonstrating . . . a probable benefit to the minor by a [Department] commitment.'"" (*In re N.C., supra*, 39 Cal.App.5th at pp. 85-86; accord, *In re Calvin S.* (2016) 5 Cal.App.5th 522, 528; see § 734 ["No ward of the juvenile court shall be committed to [the Department] unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by [the Department]."].)

"We review the juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision. [Citation.] """In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.""""" (*In re N.C., supra*,

39 Cal.App.5th at p. 85; see *In re Carlos J.* (2018) 22 Cal.App.5th 1, 5.)

2. *The Juvenile Court Considered Out-of-state Placement as a Less Restrictive Alternative, but Found It Was Not Appropriate for D.H.*

Contrary to D.H.'s contention, the juvenile court considered a less restrictive placement before committing him to the Department. At the disposition hearing the court heard, considered, and rejected the probation officer's recommendation the court place D.H. at a facility in Iowa. The court found that the probation officer's reasons for not committing D.H. to the Department—that other juveniles there would know D.H. and that juveniles view placement with the Department negatively— did not justify an out-of-state placement. There was no evidence the Department's programs were not available or adequate for D.H.'s needs. (See § 727.1, subd. (b)(1) ["the court shall not order the placement of a minor who is adjudged a ward of the court" in a "residential facility or program . . . outside of the state, unless" it finds that "[i]n-state facilities or programs have been determined to be unavailable or inadequate to meet the needs of the minor"].) To the contrary, the probation officer testified that there was no difference in the rehabilitative services the two facilities offered and that the Department's programs were essentially as good as those at the Iowa facility. Even counsel for D.H. recognized that placement with the Department could be positive for D.H.

The juvenile court was also appropriately concerned about public safety and the safety of D.H. (See *In re Carlos J.*, *supra*, 22 Cal.App.5th at pp. 5-6 [because the purpose of juvenile court

11

law is to provide for "'the protection and safety of the public and each minor under the jurisdiction of the juvenile court,'" the court "may properly consider 'a restrictive commitment as a means of protecti[on]'"]; see also § 202, subd. (a).) The court considered the risks D.H. would pose if placed in a less restrictive environment and stated D.H.'s recent conduct created a danger to others, including a risk that D.H. might kill someone. And when the court asked the probation officer whether the Iowa facility was a locked facility, the probation officer could not confirm it was.

Moreover, although "juvenile placements need not follow any particular order under section 602 and section 777, including from the least to the most restrictive" (*In re Eddie M.* (2003) 31 Cal.4th 480, 507; see *In re A.M.* (2019) 38 Cal.App.5th 440, 449 ["'"'[a]lthough the [Department] is normally a placement of last resort, there is no absolute rule that a [Department] commitment cannot be ordered unless less restrictive placements have been attempted"'"'"]), the juvenile court placed D.H. in every possible less restrictive environment before placing him with the Department. The court stated that it had tried less restrictive placements, including probation at home, community detention, juvenile hall, and camp, but that all of those placements were unsuccessful. In fact, D.H. was under a home-on-probation order when he committed his most recent offenses. (See *In re Greg F.*, *supra*, 55 Cal.4th at p. 408 ["if the minor has been given an opportunity to benefit from probation after committing a [Department]-eligible offense, and then goes on to commit a new offense while on probation, the interests of justice and the welfare of the minor may be best served by a [Department] commitment"].) Not only had less restrictive placements failed to deter D.H. from committing additional crimes, he committed

more serious crimes as he became older and his placements became progressively more restrictive. (See *In re A.R.* (2018) 24 Cal.App.5th 1076, 1082 [minor's placement history "leaves little doubt that less restrictive alternatives have been wholly ineffective in rehabilitating" him, and the "need for a significant change from prior placements is amplified by his age" because "there is little time remaining before he faces the adult correctional system"].)

### 3. *The Juvenile Court Found That Commitment to the Department Would Benefit D.H.*

D.H. also argues the juvenile court did not "find, on the record," that commitment to the Department would "provide a probable benefit" to D.H. The court, however, did make that finding.

"There is no requirement that the court find exactly how a minor will benefit from being committed to [the Department]. The court is only required to find if it is probable a minor will benefit from being committed." (*In re Jonathan T., supra,* 166 Cal.App.4th at p. 486.) A juvenile court may find it probable a "minor would benefit from being committed to [the Department], because it anticipate[s] minor's needs would be addressed by programs offered at [the Department]." (*Ibid.*)

The juvenile court found the Department offered appropriate vocational, counseling, and other programs from which D.H. would benefit. The court also found minors committed to the Department can make progress, improve, and learn to make good decisions in their lives. The court stated that D.H. could benefit from the programs offered by the Department and that the court would inform the Department if D.H. had any

13

special requirements for his educational needs, which shows the court believed the Department would be able to address those needs. (See *In re Joseph H.*, *supra*, 237 Cal.App.4th at pp. 543-544 ["appropriate education is part of the treatment and rehabilitative services provided by [the Department]"]; cf. *In re Calvin S.*, *supra*, 5 Cal.App.5th at pp. 526-527, 532 [juvenile court abused its discretion in committing a minor with a developmental disability and an "extremely low" IQ to the Department rather than juvenile hall because juvenile hall gave the minor access to regional center services not offered by the Department].)

Although the juvenile court did not specifically identify which Department programs would benefit D.H., the court stated it had reviewed the descriptions of the programs and found them appropriate. And in its minute order and commitment order, the court found that the "mental and physical condition and qualifications of this youth render it probable that [he] will benefit from the reformatory discipline or other treatment provided by the [Department]." (See *In re A.R.*, *supra*, 24 Cal.App.5th at p. 1081 [although the juvenile court did not identify the specific programs that would benefit the minor, the court found the minor would probably benefit from a commitment where the minor "had a long history with the juvenile system," the juvenile court "had already tried various less restrictive placements," and the court found a "'need for drastic measures'"].)

B.     *D.H. Is Entitled to Additional Predisposition Custody Credit*

D.H. argues that the juvenile court miscalculated his predisposition custody credit and that he is entitled to 333 days,

14

not 301 days.[6]  The People concede D.H. "appears to be correct." He is.

"Section 726 provides that when a 'minor is removed from the physical custody of his or her parent or guardian as the result of an order of wardship made pursuant to Section 602, the order shall specify that the minor may not be held in physical confinement for a period in excess of the maximum term of imprisonment.'" (*In re Edward B.* (2017) 10 Cal.App.5th 1228, 1238; see § 726, subd. (d)(1).)  "In a juvenile delinquency proceeding, 'a minor is entitled to credit against his or her maximum term of confinement for the time spent in custody before the disposition hearing.'" (*In re A.M.*, *supra*, 225 Cal.App.4th at p. 1085; see Pen. Code, § 2900.5; *In re Stephon L.* (2010) 181 Cal.App.4th 1227, 1231-1232.)  "[W]hen a juvenile court elects to aggregate a minor's period of physical confinement on multiple petitions . . ., the court must also aggregate the predisposition custody credits attributable to those multiple petitions." (*In re Stephon L.*, at p. 1232.)

The juvenile court committed D.H. to the Department for violating probation imposed for the firearm possession adjudication and for violating probation imposed for the robbery adjudication.  He was detained and placed in juvenile hall for

---

[6]    "'Because an adult would be entitled to presentence custody credit under Penal Code section 2900.5, this has been interpreted to mean that an equivalent amount of time must be subtracted from a minor's maximum period of physical confinement. [Citations.]  Inasmuch as a minor is not "sentenced," it would simply be incorrect to refer to . . . this as "presentence" custody credit.  In the juvenile context, the correct term is "precommitment" [citation] or "predisposition" custody credit.'" (*In re J.M.* (2009) 170 Cal.App.4th 1253, 1256.)

15

violating these adjudications on March 19, 2018, when his predisposition custody credits began to accrue. The juvenile court subsequently ordered D.H. to camp, where he remained until he was released home on probation on December 6, 2018, 263 days later. D.H. was detained again on December 21, 2018 and placed in juvenile hall, where he remained until the disposition hearing on February 28, 2019, 70 days later. Thus, D.H. is entitled to 333 (263 + 70) days of predisposition custody credit.[7]

## DISPOSITION

The juvenile court's commitment order is modified to reflect 333 days, rather than 301 days, of predisposition custody credit against D.H.'s maximum term of physical confinement. In all other respects the juvenile court's order is affirmed. The juvenile court is directed to send a corrected copy of the order to the Department and to the Health and Human Services Agency.

SEGAL, J.

We concur:

PERLUSS, P. J.                FEUER, J.

---

[7]   D.H. suggests in his opening brief that his total predisposition custody credit "is possibly higher," but he does not affirmatively argue it is.