Filed 9/10/21  In re J.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re J.M., a Person Coming Under the Juvenile Court Law.

THE PEOPLE,

    Plaintiff and Respondent,

v.

J.M.,

    Defendant and Appellant.

E075111

(Super.Ct.No. INJ1800063)

OPINION

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Kathryn Kirschbaum and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

1

The juvenile court found defendant and appellant, J.M. (minor), in violation of the terms of his probation and committed him to the Department of Juvenile Justice (DJJ). Minor contends the court erred by failing to address his special educational needs prior to committing him to the DJJ. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

A.      *Paragraph 2*, *First Petition Subsequent*

On December 6, 2017, minor entered the sliding glass door at the rear of a residence and stole approximately $188 worth of medical marijuana, three porcelain figurines, earbuds, a wireless speaker, a colored pipe, two medication prescriptions, cellphone headphones, and a number of other items. Minor admitted committing the burglary.

B.      *Paragraph 3, First Petition Subsequent*[2]

On January 16, 2018, someone entered another residence and stole several bottles of alcohol, a laptop, a cordless drill, two gaming consoles, four wireless game controllers, several video games, two speakers, an iPod touch, an iPad, and a box containing the victim's deceased dog's ashes. Minor denied committing the burglary; however, video

---

[1] Minor turned himself in on February 22, 2018, after his coparticipant was arrested; he admitted committing the crime for which his coparticipant was arrested but also admitted committing several prior crimes as well. After further investigation, defendant admitted to committing additional crimes. Thus, the People filed three separate petitions as more offenses came to light. For ease of understanding, we present the offenses in chronological order.

[2] The court later dismissed paragraph 3 of the first petition subsequent upon the People's motion.

2

on minor's cellphone had a "'Geo Tag,'" which reflected his phone was two residences away from the burglarized home on the day and at the time of the burglary. The phone also had a video of minor's coparticipant standing in front of a smashed rear door at the same time.

### C. Paragraph 1, First Petition Subsequent

On February 1, 2018, minor kicked in the doggy door of a residence and shattered its glass door; he entered the residence and opened all of the kitchen cabinets. He left the garage door open.

### D. Paragraph 4, First Petition Subsequent

On February 13, 2018, minor entered a convenience store, wearing a mask, and pointing what appeared to be a handgun at the clerk. He demanded money and yelled, "'I'll blow your brains out.'" He got away with $500.

### E. Paragraph 5, Initial Petition

On February 16, 2018, minor entered another convenience store, armed with what appeared to be a handgun, and got away with approximately $116 from the register. Minor admitted getting away with an unknown amount of money.

### F. Count 1, Second Petition Subsequent

On February 16, 2018, minor entered a gas station, pointed what appeared to be a black handgun at the clerk, and said: "'Give me the fucking money. I have nothing to lose, I'll blast you!'" Minor left with $100 and two bottles of wine. Minor admitted committing the robbery.

3

*G.     Paragraphs 2 and 3, Initial Petition*

On February 21, 2018, around 12:47 p.m., minor participated in the robbery of two victims' backpacks.

*H.     Paragraph 4, Initial Petition*

At 1:42 p.m., on February 21, 2018, minor participated in another armed robbery of a victim's bag.  Minor admitted being the one who pointed the gun at the victim. Officers later recovered a check in the victim's name from minor's coparticipant's car.

*I.     Paragraph 1, Initial Petition*

On February 21, 2018, around 7:59 p.m., minor robbed a pizza delivery man, taking $200 and a large pizza; minor had what appeared to be a handgun.  The victim reported that he saw a vehicle circling the parking lot, but he did not know if it was involved in the robbery.

*J.     Further Facts*

An officer stopped a vehicle in the vicinity of the robbery of the pizza delivery man, which matched the description of a vehicle reported to be involved in a series of recent robberies.  The officer "could smell a strong odor of marijuana and alcohol" emanating from the vehicle.  He observed a wine bottle and beer can on the floorboard. While the officer was issuing a ticket to the driver for having an open container, the driver opened the glove box to retrieve her registration; the officer observed what appeared to be a prescription medication container; he confirmed the pill inside was Xanax and placed the driver under arrest for possession of a controlled substance without a prescription.  (§ 11375, subd. (a)(2).)

4

While taking an inventory of the vehicle, officers located an airsoft pistol and a check issued to the victim of the robbery alleged in paragraph 4 of the initial petition. That victim positively identified the driver as the getaway driver; the victim also identified one of the other individuals in the car as being involved in the robbery.

Minor later turned himself in and admitted to being responsible for the robbery of the pizza delivery man and the four prior robberies, which made up the remaining allegations in the initial petition. Minor told the officer the "handgun" used in the robberies was an airsoft BB gun. Minor directed the officer to where minor had disposed of the BB gun; the officer found an airsoft gun, which was "large enough to resemble a 9mm handgun," without the orange safety tip.

Minor reported that he had committed the first robbery because his dogs were detained at the humane society, and he needed $340 to get them out. He said he obtained $340 from the first robbery, which he used to get his dogs out. Minor said he blackmailed the driver to participate in the robberies by telling her he was going to release nude pictures of her if she refused. He reported that the Xanax pills and alcoholic beverages found in the vehicle belonged to him.

Minor was enrolled in the 10th grade. He had 27 unexcused absences, 20 tardies, and three days of suspension for the school year. Minor reported drinking three times weekly and using marijuana daily. Minor had been living with a friend's mother; he had no contact information for his father.

5

On February 23, 2018, the People filed a Welfare and Institutions Code section 602[3] petition, alleging minor had committed five robberies by force or fear. (Pen. Code, § 211, ¶¶ 1-5.) On February 26, 2018, the court detained minor in juvenile hall.

Further investigation revealed additional crimes committed by defendant. On March 21, 2018, the People filed a subsequent petition alleging minor had committed three burglaries (Pen. Code, § 459, ¶¶ 1-3) and a robbery (Pen. Code, § 211, ¶ 4) in addition to the allegations in the original petition. On April 18, 2018, the People filed a second, subsequent petition alleging minor had committed an additional robbery. (Pen. Code, § 211, count 1.)

In a report filed June 1, 2018, the probation officer noted minor had been expelled from one school district on June 13, 2017, which he had attended for one year but had only earned six units out of a possible 60. Minor admitted he behaved poorly and was very defiant. He said his behavior was due to having attention deficit hyperactivity disorder (ADHD), which he was diagnosed with in fourth grade and for which he had been taking medication. When asked, minor responded that he had never been referred for an independent education plan (IEP).

Minor said he was having tough times because his father and stepmother were getting a divorce and had lost their home. Minor's mother abandoned him when he was 15 months old. Minor had been seeing a therapist once weekly since he was detained. The therapist stated there was nothing negative to report, and minor was not taking any

---

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

prescribed medication. Minor was also participating in a voluntary therapy program designed for incarcerated youth. He alleged he had been sexually molested by his father's cousin when he was a small child. Minor had a dependency history, which included a substantiated allegation of general neglect by father in 2016.

During a search of minor's room on February 1, 2018, officers discovered several items of "light" tagging. On the same day, minor was involved in a physical fight in which he defended himself from an aggressor. However, on March 22, 2018, minor was involved in two other fights, in at least one of which he was the aggressor.

Minor reported that at some point, his father had been arrested for domestic violence; his stepmother obtained a restraining order against his father, which resulted in minor being unable to visit his father. A record's check reflected that father was charged with battery and child endangerment, but he pled guilty to misdemeanor battery. (Pen. Code, § 242.) Father was granted 36 months' summary probation; however, his probation was revoked for failing to enroll in a domestic violence class. Father was cited and released but failed to appear. A bench warrant was issued and remained active. Minor reported running away from home twice thereafter.

The interagency placement screening committee identified minor's "'treatment needs . . . as individual counseling, grief counseling, self-esteem training, family counseling, behavioral health services, drug treatment, anger management, victim awareness, impulse control, peer issues, sexual abuse treatment, and [educational] credit recovery.'" The committee believed placement in a secured facility, such as the DJJ, was warranted because minor's "'identified problems and treatment [could not] be adequately

7

addressed by conventional private placement programs and support by probation field services.'" Considering all aspects of minor's personal history, the offenses, and the committee's recommendation, the probation officer recommended minor be committed to the DJJ, where he would "be afforded the opportunity to address his trauma, lack of school credits, victim awareness, and various other programs." On June 18, 2018, the court appointed a doctor to conduct a confidential psychotherapist examination of minor.

At the hearing on July 16, 2018, the People moved to dismiss paragraph 3 of the first subsequent petition, which the court granted. Minor admitted the remaining allegations in all three petitions. The court found the allegations true. Minor waived the confidentiality of the psychologist's report so the probation department, the People, and the court could consider the report at the contested dispositional hearing.

In his evaluation, the psychologist reported that minor had denied ever having an IEP. Minor also reported that "he was treated with Adderall for ADHD from about age nine to 14." He stopped taking the medication, even though it was helpful, because he felt tired all the time and "'wasn't myself.'" Minor "had multiple counselors on and off having to do with behavior problems at school." However, minor believed the counseling was unhelpful, and he stopped attending when he was 13 or 14 years old. Nonetheless, minor was being treated by mental health staff while in juvenile hall.

The psychologist noted that "[i]t appeared [minor] had benefited from the structured nature of the program" in juvenile hall; minor had "considerable anxiety about the course of his life, given abandonment by both parents"; and "[h]e obsessively dwelled

8

on being abandoned by both parents." Minor's father said minor had never had an IEP and father would provide minor's school records to the psychologist, but he never did.

The psychologist summarized by noting that minor "had been diagnosed [with] ADHD but had not been provided with any . . . special programming for his learning disorder." He never had an IEP: "This would likely have reduced emotional stress on him, which would likely have reduced [his] acting out behavior. He did not receive any psychiatric evaluations, as a change in medication, which had been prescribed by a pediatrician, might have reduced impulsivity and [his] acting out behavior. He suffered from Posttraumatic Stress Disorder but did not receive any treatment for this." The psychologist recommended minor receive intense psychotherapy, a psychiatric evaluation, be placed in a substance abuse program, and stated that he "very much needs an [IEP] and relevant special services for his learning disorder and associated behavior problems."

On October 9, 2018, minor's counsel filed a memorandum of points and authorities in support of minor's proposed dispositional plan. Minor's counsel argued a community based, out-of-home placement would best suit minor's needs.

At the dispositional hearing on December 10, 2018, minor's father testified he and minor had been in counseling since minor was a child. Minor had been seeing a therapist for between three and four years. Father said, "[W]e got behind [in the] IEP's. We couldn't schedule enough appointments to . . get everything back on track." When father referred to "programs," he was speaking of "individual educational programs." Minor was in an IEP "because he has attention deficit. He was born with it, ADHD, the

9

hyperactivity, you know, on top of his new things. which are all triggering things to go all haywire with his trauma, that he's experiencing P.T.S.D." The IEP was "dealing solely with [minor's] ADHD." "[W]e're rolling into . . . different IEPs." The school district was trying to schedule continued appointments with minor, but minor was incarcerated.

Father left minor in Palm Springs while he was working in Pasadena so that minor could continue at his school, in his programs, and in his extracurricular activities. Father left him with a "mentor," who was later hit and killed by a vehicle; minor then went to stay with a friend. Father requested minor be released to his custody. He was willing to cooperate with the probation department and its recommendations.

After argument by counsel, the court asked minor's counsel if there were "any treatments that DJJ offers that would be suitable for the minor that he would not get in another placement?" Defense counsel responded that minor could get all the treatment he needed in placement. The People responded that the DJJ had a number of programs, which would be beneficial to minor, including at least one of which was better than any program minor could receive in placement. The probation officer said that "some of the programs at DJJ are just more intensive and the personnel . . . are better trained to address his needs as opposed to" placement.

The court noted that the nature and number of crimes minor committed were "disturbing"; minor appeared to be the leader of a group of juveniles who committed the crimes. The court observed that minor's behavior in juvenile hall was "substandard." Although the crimes minor committed were less impulsive than those it regularly saw, they were sophisticated.

The court also noted several mitigating factors including minor's lack of a prior record, his ADHD, his witnessing his mentor's death, his motive to get his dogs back, the lack of physical injuries to any of the victims, his abandonment by his mother, and his sexual molestation. The court found there were no services in the DJJ, which minor could not obtain in placement. The court observed that minor had already been in custody for almost 10 months and had never been given a chance on any kind of probation.

The court placed minor on probation in a youth treatment and education center (YTEC) to be released to the custody of father upon graduation. However, the court warned minor: "If you fail, if you get into fights, if you don't do what you have to do and follow the guidelines of Probation, nothing will stop you from being sent to" the DJJ.

In the detention reports filed September 18, 2019, the probation officer reported minor had committed a violation of the conditions of his wardship by physically assaulting another youth without provocation. A section 777 petition was filed alleging a violation of minor's probation based on the assault. On September 19, 2019, the court detained minor on the petition.

On December 16, 2019, a memorandum regarding disposition was filed, reporting minor had been placed on safety watch multiple times for self-harm and suicidal behavior, he was disruptive, and he continued to be involved in fights and show aggressive behavior. The probation officer noted that minor was "not identified as a student with special needs." The interagency placement screening committee believed that minor's needs could not be addressed by conventional private placement programs,

11

and minor should be placed in a secured facility, such as the DJJ. The probation officer opined that minor was "no longer amenable to probation services." Minor's "continued violent behavior suggests he remains a serious risk to the community and demonstrates he is in need of a highly structured and well-supervised environment." The probation officer recommended placement with the DJJ. On the same date, minor admitted the truth of the allegation that he had violated his probation.

On December 19, 2019, the court held the contested dispositional hearing. Minor's counsel argued that a DJJ placement was inappropriate, in part, because minor still had not been medicated for his ADHD: "The minor's situation is such that he has a disability, which is ADHD, and that he needs medication for that. Once he was placed at YTEC, I was assuming that . . . medication would be prescribed, it was. The minor indicated that he didn't want to take the medication. Although, . . . I have since informed him that that's probably the reason why he's having a lot of these difficulties in school and some of the [problems] that had occurred while he was at YTEC."

The court observed, "[A]s far as the ADHD is concerned, that most likely did have a negative effect on [minor] in his ability to . . . monitor his behavior." However, "[minor] certainly has the right to not seek treatment, but that's a willing choice. And if there's consequences that come from the choices that he made, then that's partly why we are here. [¶] It's very significant to me . . . that after approximately nine months at YTEC there's still serious . . . issues going on with [minor]. [¶] I think at this time . . . it's very clear that less restrictive alternatives are not appropriate and they are not going to be effective . . . . [¶] . . . [¶] I do think there's substantial evidence that the programs

12

that are described here in this report, that are offered at DJJ, would be beneficial, I do think that that is in his best interest at this point."

Father continuously interrupted the judge, at one point saying, "We have a complete IEP for him out there." The court ruled: "[A]t this time, I am going to follow the recommendation, as contained in this report. He will be continued as a ward of the Court. He will be committed to the Division of Juvenile Justice." "And just so it's clear for the record, . . . I do find that based on the evidence included in these two reports that the less restrictive alternatives are inappropriate and will not be effective for him." The court ordered a mental evaluation of minor and urged him to take any prescribed medication.

## II. DISCUSSION

Minor contends the court erred by failing to address his special educational needs, specifically, his ADHD diagnosis and the need for an IEP, prior to committing him to the DJJ. The People contend minor forfeited any failure of the court to address his special education needs by failing to object on that basis at either of his dispositional hearings and by failing to request an IEP at either hearing. We hold that the court acted within its discretion in committing minor to the DJJ.

"When determining the appropriate disposition in a delinquency proceeding, the juvenile courts are required to consider '(1) the age of the minor, (2) the circumstances and gravity of the offense[s] committed by the minor, and (3) the minor's previous delinquent history.' [Citations.] Additionally, 'there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJJ] commitment and the

13

inappropriateness or ineffectiveness of less restrictive alternatives.' [Citation.] 'A juvenile court's commitment order may be reversed on appeal only upon a showing the court abused its discretion.'" (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 484-485.)

"'The appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision.' [Citation.] 'A DJJ commitment is not an abuse of discretion where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate.' [Citation.] 'Although the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted.'" (*In re A.R.* (2018) 24 Cal.App.5th 1076, 1080-1081.)

Here, the court considered all the relevant factors prior to committing minor to the DJJ. At the outset, the court noted it had read the dispositional memorandum filed December 16, 2019, as well as the previous dispositional memorandum filed June 1, 2018. The court noted that the previous dispositional memorandum had similarly recommended a commitment to the DJJ. The court indicated it had also read the reporter's transcript from the previous dispositional hearing.

Those memoranda and the previous hearing transcript reflect minor's age, the circumstances and gravity of minor's offenses, and his previous delinquency history. The previous court expressly indicated that the nature and number of minor's offenses were "disturbing." That court also noted minor's lack of a previous delinquency record, but when placing minor in a placement facility, it specifically warned minor that if he got

14

into fights "nothing will stop you from being sent to" the DJJ. Thus, the court had already afforded minor a less restrictive placement despite recommendations to the contrary.

Despite minor's initial placement in a less restrictive environment and the court's warning not to engage in physical altercations, minor continued to have behavioral issues. The court expressly found that a less restrictive placement would not be effective for minor, and the programs at the DJJ would benefit him. The court's order committing minor to the DJJ was within its discretion.

Minor contends the court should have addressed minor's special educational needs, specifically minor's diagnosis of ADHD and the need for an IEP, prior to committing him to the DJJ. The People contend minor forfeited any failure of the court to address his special education needs by failing to object on that basis at either of his dispositional hearings and by failing to request an IEP at either hearing. We agree with the People that minor forfeited the issue of whether the court should have ordered an IEP. Regardless, the court's order committing minor met minor's educational and mental health needs.

"[C]ourts have repeatedly held that a party's failure to object forfeits appellate review . . . in juvenile proceedings." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1508.) "A commitment decision, especially a decision involving a minor with multifarious complex problems . . . cannot be driven by one problem." (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 543.) "Providing a child with an appropriate education is part of the treatment and rehabilitative services provided by [the DJJ], so any commitment to

15

such a facility necessarily includes services for any special educational needs [citation], among other important considerations. The minor's special education needs [do] not trump other factors the court [is] required to weigh in making its commitment decision." (*Id.* at pp. 543-544, fn. omitted.)

Here, at neither dispositional hearing did minor's counsel request the court order an IEP. Thus, minor forfeited the issue. Nevertheless, as the People note, section 1120, subdivision (b), requires the DJJ to "assess the educational needs of each ward upon commitment and at least annually thereafter until released on parole." Thus, regardless of whether an IEP had been ordered, the DJJ would provide minor with an appropriate education. (*In re Joseph H.*, *supra*, 237 Cal.App.4th at pp. 543-544.)

Similarly, as to minor's ADHD, the record is replete with attempts by the probation department to address minor's mental health issues. However, minor repeatedly declined to take his medication as prescribed. As the court observed, "[Minor] certainly has the right to not seek treatment, but that's a willing choice. And if there's consequences that come from the choices that he made, then that's partly why we are here." The probation department outlined plans to treat minor's mental health issues if minor were committed to the DJJ. Moreover, the court's order of a mental evaluation of minor ensured that minor's mental health issues would be addressed by the DJJ.

Minor cites *In re Angela M.* (2003) 111 Cal.App.4th 1392 (*Angela M.*) for the proposition that we must reverse the commitment order and remand so that the juvenile court can order an IEP. In *Angela M.*, a doctor had diagnosed the minor with bipolar disorder and ADHD; the doctor "reported 'she must undergo an IEP . . . assessment."

16

(*Id.* at p. 1395.)  The juvenile court ordered the minor committed to the California Youth

Authority, now the DJJ.  (*Id.* at p. 1396.)  Pursuant to former California Rules of Court,

rule 1493(d)(5),[4] which required that the court consider the educational needs of the child

when declaring the minor a ward of the court, the appellate court remanded the matter "to

permit the juvenile court to make proper findings, on a more fully developed record,

regarding [the minor]'s educational needs." (*Angela M.*, at p. 1399; see *id.* at pp. 1397-

1398.)

"*Angela M.* stands for the proposition that where the juvenile court is on notice

that special attention to a minor's educational needs is appropriate, the court must make

adequate findings on a sufficient record as to whether the minor has special educational

needs before it commits the minor to DJJ." (*In re I.V.* (2017) 11 Cal.App.5th 249, 259.)

However, in the instant matter, "the court expressly considered [minor's] needs,

particularly his need for greater structure and support," in ordering a mental evaluation.

(*Id.* at p. 259; see *Angela M.*, *supra*, 111 Cal.App.4th at p. 1399.)  Unlike in *Angela M.*,

here, a "more fully developed record" is not required.  (*Angela M.*, at p. 1399.)

Moreover, *Angela M.* relied on California Rules of Court, former rule 1493(d)(5),

which required juvenile courts to "consider the educational needs of the child" when

declaring a child a ward of the court.  The current rule has no such requirement.  (See

Cal. Rules of Court, rule 5.790(h)(5).)  Thus, *Angela M.* is distinguishable in that it

---

**4** The court erroneously cited to nonexistent "rule 1493(e)(5)." (*Angela M.*,
*supra*, 111 Cal.App.4th at p. 1398.)

17

applied a rule that no longer exists.  The court's order committing minor to the DJJ was within its discretion.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P.J.

FIELDS
J.