Filed 9/29/23  P. v. Tucker CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094537 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE000002) |
| v. | |
| LEON ALEXANDER TUCKER, | |
| Defendant and Appellant. | |

A jury found defendant Leon Alexander Tucker guilty of second degree murder as a lesser included offense of first degree murder.  (Pen. Code, § 187, subd. (a).)[1]  The jury also found true allegations that he personally used a firearm causing great bodily injury or death (§ 12022.53, subds. (b) – (d)) and was 16 years of age or older at the time of the

---

[1] Undesignated statutory references are to the Penal Code.

1

offense (Welf. & Inst. Code, § 707, subd. (a)). The trial court sentenced defendant to 15 years to life, plus 25 years to life for the firearm enhancement.

Defendant appeals, arguing he received ineffective assistance of counsel. Defendant also argues the trial court erred in refusing to strike the firearm enhancement. We will reject both contentions and affirm the judgment.

## I. DISCUSSION

### A. *Shooting on the Levee*

Defendant, age 17 at the time, lived in a four-unit apartment building in Sacramento. The victim, Steven Matthews, lived in an abandoned car in a parking lot behind the building. A neighbor was awakened by the sounds of an argument, followed by a gunshot, in the early morning hours of December 3, 2017. She called 911. A short time later, Matthews' lifeless body was found on the levee behind the apartment building. He had been shot in the back of the head.

Sacramento police officers responded to the area and canvassed the nearby apartment buildings. A neighbor said she heard two men yelling on the morning of December 3, 2017. One of the men, Matthews, was banging on doors and "ducking and dodging." Another man, whose face was concealed by a hood, cornered Matthews and pointed something long and stick-like at him.

Another neighbor saw two men near Matthews' campsite next to the abandoned car. One of the men told the other to go get his gun. The neighbor then saw Matthews running, followed by the other man. Still another neighbor said defendant came to the window of his apartment the night before the shooting and asked that he remove a security camera trained on the levee. Defendant was carrying a gun.

### B. *Police Interview*

Defendant was arrested on the morning of January 9, 2018. He was taken to the station and placed in an interview room, where he waited for nearly two hours. Defendant spent most of this time appearing to doze, resting his head and arms on the

table.  He also used the restroom, performed push-ups, and rapped quietly to himself.  He was then *Mirandized*[2] and interviewed.  The interview and period preceding the interview—including *Miranda* advisements—were all video recorded.

Defendant began the interview by acknowledging that he knew Matthews and considered him "like a brother."  Defendant also acknowledged arguing with Matthews the day before the shooting.  However, defendant insisted the argument was not serious.  Defendant also said he had been at a friend's house at the time of the shooting.  Detectives responded by telling defendant he had been seen near the apartment—and caught on video tape—on the night of the shooting.

Defendant then made a series of damning admissions.  He first admitted that he and Matthews had recently stolen a rifle from an acquaintance; however, defendant insisted that Matthews kept the weapon.  He then admitted that he kept the rifle, but said it was not loaded.  He then admitted shooting Matthews.

Defendant explained that he and Matthews repeatedly argued about who should get to keep the stolen rifle.  One such argument occurred on the day before the shooting.  According to defendant, Matthews demanded he turn over the rifle, and choked defendant with a dog chain and threatened him with a knife when he refused to do so.  Defendant told detectives he extricated himself from the situation and returned to his apartment.  He later retrieved the rifle and found Matthews.  The two men walked to the levee.  Defendant told Matthews he just wanted to talk.  Defendant produced the rifle, believing it to be unloaded.  Matthews ran away, saying, "Get away . . . .  I shoulda killed you when I had the chance."  It was then, defendant said, that the rifle went off.  Defendant said he stood on the levee for several minutes in a state of shock and confusion, and then walked away.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

*C.     Motion to Suppress*

Defendant moved to exclude his interview statements on the grounds they were coerced and involuntary.  Defendant argued the detectives used manipulative interrogation techniques and lied about the evidence against him.  Defendant also argued his confession should be considered involuntary—notwithstanding his *Miranda* waiver— given his age and the general tendency of young people to be vulnerable to police pressure.  (See generally Welf. & Inst. Code, § 625.6, subd. (a), amended by Stats. 2020, ch. 335, § 2, eff. Jan. 1, 2021 [requiring that minors ages 17 years or younger to consult with counsel before police conduct a custodial interrogation].)[3]  Defendant did not argue his *Miranda* waiver was other than knowing and intelligent.  The trial court denied defendant's motion, finding the detectives' questioning was not coercive and defendant's statements were voluntarily made.

*D.     Trial and Verdict*

The matter was tried to a jury over the course of several days in May 2021.  The prosecution's witnesses testified substantially as described *ante*.  The prosecution also introduced a video recording and transcript of defendant's police interview.  Defendant did not present evidence on his own behalf.

The jury reached a verdict after two days of deliberations.  The jury found defendant not guilty of first degree murder but guilty of the lesser included offense of second degree murder.  The jury found true allegations that defendant personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm in the commission of the offense (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).  The jury also found true that

---

[3] Defendant does not suggest that amended section 625.6 of the Welfare and Institutions Code applies retroactively here.

defendant was 16 years of age or older at the time of the offense. (Welf. & Inst. Code, § 707, subd. (a).)

*E.*     *Sentence*

Defendant appeared for sentencing in July 2021. The trial court rejected defendant's presentence request to strike the firearm enhancements and imposed an indeterminate term of 15 years to life for second degree murder, plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)).

This appeal timely followed.

## II.  DISCUSSION

Defendant raises two sets of contentions on appeal. The first set of contentions focuses on *Miranda* issues. The second set focuses on the trial court's decision to impose the most severe firearm enhancement charged and found true by the jury. We address each set of contentions in turn.

*A.*     Miranda *Issues*

Defendant's *Miranda* arguments have evolved with the briefing. The opening brief argues the prosecution failed to establish that defendant's *Miranda* waiver was knowing and intelligent. (See generally *People v. Frederickson* (2020) 8 Cal.5th 963, 1010 ["The prosecution . . . bears the burden of showing that the waiver was knowing, voluntary, and intelligent under the totality of the circumstances"].) Defendant emphasizes that he gave an equivocal response to the *Miranda* admonition concerning his right to counsel, and urges that, as a minor, he was vulnerable to coercion and lacked the ability to appreciate the consequences of waiving his rights.[4]

---

[4] Defendant relied on the following colloquy from the police interview:

"[Detective]:  . . . You have the right to remain silent. Do you understand?

"[Defendant]:  Yeah.

5

"[Detective]:  Uh, anything you say may be used against you in court.  Do you understand?

"[Defendant]:  Yes.

"[Detective]:  You have the right to the presence of an attorney before and during any questioning.  Do you understand?

"[Defendant]:  Yeah, but I don't get it at the same time.

"[Detective]:  Oh, okay.  Uh, so I'll read it again.  You have the right to the presence of an attorney before and during any questioning if you want.  So you have that right to have an attorney present before or during any questioning.

"[Defendant]:  I still don't get it, but all right.

"[Detective]:  You s-

"[Defendant]:  Keep going.

"[Detective]:  You did-, you don't understand that you have the right to an attorney?

"[Defendant]:  Oh I do that – I do.  I didn't know I had a lawyer before like that.

"[Detective]:  What's that.

"[Defendant]:  I don't know at the same time.

"[Detective]:  E-, I- just that uh, do you understand that you have that right.

"[Defendant]:  Yeah, yeah.

"[Detective]:  You, you understand you have the right to that.

"[Defendant]:  Yeah."

The People's response argues defendant forfeited any challenge to the validity of the *Miranda* waiver. Although defendant argued his *confession* was involuntary, the People said, he did not argue the *waiver* was other than knowing, intelligent, and voluntary. Accordingly, the People argued the *Miranda* challenge had not been preserved for appeal.

Defendant responded with an ineffective assistance of counsel argument. In a supplemental opening brief, defendant effectively conceded the forfeiture, arguing defense counsel could have had no tactical reason for failing to challenge the *Miranda* waiver. We accept the concession and proceed directly to the ineffective assistance of counsel argument. (Evid. Code, § 353, subd. (a); *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 ["If a defendant fails to make a timely objection on the precise ground asserted on appeal, the error is not cognizable on appeal. [Citation.] Accordingly, unless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal, even if the defendant asserted other arguments under the same decision"].)

To establish a claim of ineffective assistance of counsel, defendant must "demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. [Citations.] A 'reasonable probability' is one that is enough to undermine confidence in the outcome." (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687.) In evaluating counsel's actions at trial, "[a] court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. [Citation.] Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances." (*People v. Dennis, supra,* at p. 541.)

7

The record here suggests defense counsel made a tactical decision to focus on the general vulnerability of minors to police pressure, rather than the particulars of defendant's *Miranda* waiver. We cannot say that tactical judgment was unreasonable. True, defendant offered an ambiguous response to the *Miranda* admonition concerning his right to counsel ("[Detective]: You have the right to the presence of counsel before and during any questioning. Do you understand?" "[Defendant]: Yeah, but I don't get it at the same time"). However, defendant had no trouble with any of the other admonitions, and appeared to clarify that he had not previously understood he had a right to counsel before questioning ("I didn't know I had [a right to] a lawyer before like that"), but now understood he had that right ("Yeah, yeah"). Defense counsel could have reasonably believed that the *Miranda* colloquy was not enough to raise doubts as to the validity of defendant's waiver.

Defense counsel could have also believed that there was little support for a challenge to defendant's *Miranda* waiver in the wider record. The video recording of the police interview shows that defendant was alert and attentive throughout the *Miranda* warnings, nodding his head in the affirmative when asked whether he understood he had the right to counsel. The record also reveals that defendant was no stranger to the criminal justice system, having suffered juvenile adjudications in Virginia for grand larceny (auto), reckless driving, and breaking and entering, among other offenses. Given these circumstances, defense counsel could have reasonably concluded that the trial court would be unlikely to find defendant's *Miranda* waiver was anything other than knowing and intelligent. That being so, defense counsel could have reasonably opted for another approach.

Rather than focus on the particular circumstances surrounding defendant's *Miranda* waiver, defense counsel could have reasonably decided to focus on the problems raised by juvenile confessions in general. (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8 ["When counsel focuses on some issues to the exclusion of others, there is a

8

strong presumption that he did so for tactical reasons rather than through sheer neglect"].) Those problems have been amply documented in California case law (See, e.g., *In re Joseph H.* (2015) 237 Cal.App.4th 517, 533-534 ["Admissions and confessions of juveniles require special caution, and courts must use special care in scrutinizing the record to determine whether a minor's custodial confession is voluntary"]; see also *In re Elias V.* (2015) 237 Cal.App.4th 568, 588 ["children and adolescents are much more vulnerable to psychologically coercive interrogations and in other dealings with the police than resilient adults experienced with the criminal justice system"]), and have now prompted the Legislature to enact Welfare and Institutions Code section 625.6, on which defendant continues to rely.

Welfare and Institutions Code section 625.6 went into effect on January 1, 2018, some eight days before defendant's police interview. (Stats. 2017, ch. 681, § 2.) Subdivision (a) of Welfare and Institutions Code section 625.6, as originally enacted, provided that: "Prior to a custodial interrogation, and before the waiver of any Miranda rights, a youth 15 years of age or younger shall consult with legal counsel in person, by telephone, or by video conference. The consultation may not be waived." Welfare and Institutions Code section 625.6, subdivision (b) provided that: "The court shall, in adjudicating the admissibility of statements of a youth 15 years of age or younger made during or after a custodial interrogation, consider the effect of failure to comply with subdivision (a)." Welfare and Institutions Code section 625.6 was amended, effective January 1, 2021, to apply to youths 17 years of age or younger. (Stats. 2020, ch. 335, § 2.)

Defendant has consistently argued that the policy considerations underlying Welfare and Institutions Code section 625.6 apply here (even if the statute does not) and collectively compel the conclusion that the Legislature wanted to make minors' inculpatory statements inadmissible where, as here, police fail to ensure that they consult with counsel. Defendant emphasized—and continues to emphasize—the Legislature's

9

findings that children " ' "generally are less mature and responsible than adults," ' " " ' "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," ' " " 'have limited understandings of the criminal justice system and the roles of the institutional actors within it,' " and " 'characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.' " (Stats. 2017, ch. 681, § 1(a); see also *In re Anthony L.* (2019) 43 Cal.App.5th 438, 447-448 [summarizing legislative findings and declarations].)  "The Legislature also found that juveniles are less able than adults to understand the meaning of their *Miranda* rights and the consequences of waiving them, that adolescents tend to 'ignore or discount future outcomes and implications' and disregard long-term consequences of important decisions, and that juveniles are more vulnerable to 'psychologically coercive interrogations' than adults experienced with the criminal justice system." (*In re Anthony L., supra,* at p. 448.)  These findings offer an alternative lens through which to view (or review) the video recording.

In viewing the video, we are struck, as was the trial court, by defendant's casual, almost nonchalant demeanor.  As previously discussed, defendant was placed alone in an interview room, where he waited for nearly two hours. While waiting, he appeared to doze, performed push-up,s and rapped.  He did not appear anxious or even especially concerned about being in police custody.  To the contrary, as the trial court observed, defendant "appeared to be a young man too familiar with the streets and a lifestyle beyond his years."

Given the video, defense counsel could have reasonably believed that defendant's juvenile record and streetwise demeanor might be hard to square with the idea of someone unable to knowingly or intelligently waive his *Miranda* rights, but would be readily explained by the notion that, as a 17 year old, he had a " 'limited understanding[] of the criminal justice system and the roles of the institutional actors within it,' " and " 'lack[ed] the capacity to exercise mature judgment and possess[ed] only an incomplete

ability to understand the world around [him].' " (Stats. 2017, ch. 681, § 1.) That strategy, though unsuccessful, cannot be condemned as objectively deficient. Defendant's ineffective assistance of counsel claim fails.

## B.      Firearm Enhancement Issues

Defendant's sentence included an enhancement of 25 years to life for personal and intentional discharge of a firearm causing great bodily injury or death under section 12022.53, subdivision (d). Defendant argues the trial court erred in refusing to strike the firearm enhancement. We are not persuaded.

### 1.      Additional Background

As noted, the jury found true allegations that defendant personally used a firearm causing great bodily injury or death. (§ 12022.53, subds. (b) – (d).) Prior to sentencing, defendant filed a sentencing memorandum asking the trial court to strike the firearm enhancements in view of defendant's age and otherwise nonviolent criminal record. Defendant also urged the trial court to consider his difficult family history and commendable record in custody. The prosecution responded with its own sentencing memorandum, emphasizing the violent nature of the crime. The prosecution also argued the commission of the crime demonstrated planning and sophistication, in that defendant asked the neighbor to remove the security camera trained on the levee and chose to confront Matthews in the early morning hours when he was likely sleeping.

During the sentencing hearing, the trial court expressly acknowledged its discretion to strike or dismiss the firearm enhancements entirely, strike or dismiss the punishments on the enhancements, or strike a greater firearm enhancement (e.g., § 12022.53, subd. (d)) and impose a lesser included one (e.g., § 12022.53, subds. (b) or (c)). The trial court declined to exercise this discretion, stating "there is nothing deficient or even questionable about the application of [s]ubdivision (d) in this case." The trial court explained: "The defendant initiated contact with Mr. Matthews on the night of or the early morning hours of the murder. He brought a rifle with him to confront Mr.

11

Matthews, and he did so in the dark of night, at the place where Mr. Matthews slept, seemingly catching him off guard. [¶] He then chased or led Mr. Matthews up to the top of the lev[ee], where he killed him, using the rifle that he later told police he had stolen in a home burglary. [¶] Whatever beef there may have been between [defendant] and Mr. Matthews, or whatever [defendant] may have wanted to settle with Mr. Matthews, shooting him in the back of the head was a cold, callous, and utterly senseless act. This was a vicious and cruel killing."

The trial court went on to say it had considered mitigating factors, including defendant's age at the time of the offense. "On balance," however, the trial court concluded that defendant's "youthfulness and any other mitigating factors are substantially outweighed by the aggravating factors." The trial court added: "It appears to me that imposing anything short of the applicable enhancement and punishment in [section 12022.53, s]ubdivision (d) would ignore or distort an accurate reflection of [defendant's] criminal conduct, and it would minimize the significant danger he poses to society because it would significantly reduce his period of imprisonment." Accordingly, the trial court imposed an enhancement of 25 years to life under section 12022.53, subdivision (d) and stayed sentence on the remaining enhancements. (§ 12022.53, subd. (f).)

2. *Analysis*

Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). Section 12022.53, subdivision (h) authorizes the trial court to strike or dismiss enhancements in the interest of justice pursuant to section 1385.

12

A trial court's refusal to strike a firearm enhancement under section 1385 is reviewed for abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 374-375; *People v. Pearson* (2019) 38 Cal.App.5th 112, 116.)  That standard is guided by two principles.  First, the burden falls to defendant to " 'clearly show that the sentencing decision was irrational or arbitrary.' "  (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)   Second, the trial court's sentencing decision will not be reversed "merely because reasonable people might disagree."  (*People v. Preyer* (1985) 164 Cal.App.3d 568, 573.)  " 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' "  (*Ibid.*)

Defendant argues the trial court abused its discretion in several ways.  First, he argues the trial court applied improper criteria or made incorrect legal assumptions.  He emphasizes the trial court's comment that, "there is nothing deficient or even questionable about the application of subdivision (d) in this case."  In defendant's view, the comment reveals the trial court viewed its task as deciding whether application of the firearm enhancement would be "deficient" or "questionable," rather than considering the legislative intent underlying Senate Bill No. 620 (2017-2018 Reg. Sess; Senate Bill No 620) (Stats. 2017, ch. 682, §§ 1-2).  Defendant's argument fails.

"Senate Bill No. 620 amended both sections 12022.53 and 12022.5 to provide that pursuant to the trial court's authority under section 1385, the trial court could, in the interest of justice, strike or dismiss a firearm enhancement otherwise required to be imposed by those two sections. (Stats. 2017, ch. 682, §§ 1(c)-2(h).)"  (*People v. Johnson* (2022) 83 Cal.App.5th 1074, 1085-1086.)  Senate Bill No. 620 reflected the Legislature's intent to " 'allow judges "to impose sentences that fit the severity of the offense," ' and give them 'flexibility to impose lighter sentences in appropriate circumstances.' "  (*Id.* at p. 1090.)  To say that "there is nothing deficient or even questionable about the application of subdivision (d) in this case," is not to announce a new standard for striking enhancements or disregard the Legislature's intent in enacting Senate Bill No. 620.  It is

13

simply to say that application of the firearm enhancement is appropriate under the circumstances of the case. No abuse of discretion appears.

Defendant next argues the trial court abused its discretion by relying on aggravating circumstances present in every murder involving a firearm, and failed to find those same aggravating circumstances made the offense " ' "distinctively worse than ordinary." ' " (*People v. Hicks* (2017) 17 Cal.App.5th 496, 512.) Specifically, defendant argues that all murders accomplished by means of a firearm necessarily involve violence and great bodily harm, and therefore, the trial court should not have relied on those circumstances to impose the enhancement carrying the highest penalty. However, defendant makes no meaningful attempt to show that the trial court acted arbitrarily or irrationally in implicitly finding the offense was distinctively more violent or dangerous than the ordinary murder involving the use of a firearm. Nor can we agree that the offense was not distinctively worse than ordinary, given that defendant used a rifle to roust Matthews from his campsite—where he had probably been sleeping—and pursued him to the levee and shot him in the back of the head. Again, no abuse of discretion appears.

Defendant also argues the trial court erred in finding "[t]he manner in which the crime was carried out indicate[d] planning[] or sophistication." Specifically, he says the trial court's finding was inconsistent with the jury's not guilty verdict on first degree murder. Although the jury found defendant not guilty of premeditated first degree murder, the circumstances of the present case still show some measure of planning and sophistication. Defendant waited until the early morning hours to approach Matthews, when he was likely to be asleep or otherwise off guard. He asked his neighbor to remove a security camera trained on the levee and then maneuvered Matthews to the same spot, thereby ensuring he would not be caught on tape. The trial court properly imposed the upper term.

14

Finally, defendant argues the trial court failed to give due consideration to his youth.  Not so.  The trial court specifically referred to defendant's age at the sentencing hearing, calling it "a significant mitigating factor."  On balance, however, the trial court found that defendant's "youthfulness and any other mitigating factors [were] substantially outweighed by the aggravating factors."  That defendant would have weighed the mitigating and aggravating factors differently does not establish any abuse of discretion.

## III.  DISPOSITION

The judgment is affirmed.

/S/

_____

RENNER, J.


We concur:


/S/

_____

ROBIE, Acting P. J.


/S/

_____

KRAUSE, J.

15